STATE of Tennessee, Appellee,

v.

Oscar Franklin SMITH, Defendant–
Appellant.

Supreme Court of Tennessee,
at Nashville.

Nov. 18, 1993.

Rehearing Denied Jan. 5, 1994.

562

Charles W. Burson, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Victor S. Johnson, III, Dist. Atty. Gen., Thomas Thurman, Cheryl Blackburn, Asst. Dist. Attys. Gen., Nashville, for appellee.

Karl F. Dean, Public Defender, Jeffrey A. DeVasher, J. Paul Newman, Sr. Asst. Public Defenders, Nashville, for defendant-appellant.

## OPINION

DROWOTA, Judge.

The Defendant, Oscar Franklin (Frank) Smith, age 40, was found guilty by a Davidson County jury of the triple murders of his estranged wife, Judith (Judy) Lynn Smith, age 35, and her two sons by a previous marriage, Chad Burnett, age 16, a sophomore in high school, and Jason Burnett, age 13, an eighth-grader.

The jury found two aggravating circumstances in the premeditated first degree murder of Judy Smith, T.C.A. § 39–2–203(i)(5) and (12)(1982), and four aggravating circumstances in the premeditated first degree murders of Chad and Jason Burnett, T.C.A. § 39–2–203(i)(5), (6), (7) and (12)(1982),[1] and sentenced the Defendant to death on the murder counts as to all three victims. On appeal, the Defendant cites 20 errors made by the trial court including, but not limited to, the sufficiency of the convicting evidence, the sufficiency of the evidence of the four aggravating circumstances, the admission of testimony regarding the "alternative light source" technique of fingerprint identification, and the admission of the tape recordings and purported transcript of a 911 emergency telephone call allegedly made from the victim's residence just prior to the murders.

It appears that these tragic, brutal and bizarre murders occurred at approximately 11:20 p.m. on Sunday, October 1, 1989, when the Metropolitan Nashville Police Department received a 911 emergency call from 324 Lutie Street, Judy Smith's home in the Woodbine section of Nashville. On the tape of the call, which was later technically enhanced and played at trial, a young male voice, identified at trial as that of Jason Burnett, is heard crying, "Help me!" In the background another male, identified as Chad Burnett, is heard shouting "Frank, no. God, help me!" The call ended abruptly with Jason stating "324 Lutie Street." Officers dispatched to the scene arrived at the house five minutes later. They knocked on the front door and received no answer. Everything appeared quiet so the officers assessed the situation as a "false call" and left.

It was not until 3:00 p.m. the next day, that the bodies of Judy, Jason and Chad were discovered. The body of Chad was found lying face up on the kitchen floor. The room was a wreck; the phone had been ripped off the wall and large quantities of blood were on the floor and wall. An awl, a tool similar to an ice pick and often used in leatherworking, was found in the room. Chad had been shot three times: in the right

---

1. T.C.A. § 39–2–203(i) (now T.C.A. § 39–13–204(i) (1991)):

No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following: * * *
(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;
(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb; * * *
(12) The defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan.

shoulder, the upper chest, and on the inside left eyebrow. The last two wounds were contact wounds and had been fatal. Chad had also been stabbed several times in his chest, back and abdomen with a sharp, needle-like weapon (such as an ice pick or awl) and with a knife. His neck had been slashed, and there were defensive wounds on his hands. All of his injuries had occurred before death.

Judy Smith's body was found lying on its back on a bed in the front bedroom. There was blood splattered on the panelled wall next to the bed. She had been shot in the left arm and the neck. The latter wound, caused by a gun fired from a range within two feet, had severed her spinal cord and produced instant paralysis, rapid unconsciousness and death. Shortly after death, her neck had been slashed; and, like Chad, she had been stabbed with a knife and a weapon resembling an awl or ice pick. The medical examiner opined that both Judy and Chad had died from multiple gunshot and stab wounds.

The body of Jason, Judy's youngest son, was discovered lying on its left side on the floor at the foot of the bed on which his mother lay. He had not been shot. There were numerous defensive wounds on his hands. His neck had been slashed, and he had been stabbed in the chest and abdomen. Two of the wounds to the abdomen had been fatal because they had cut major veins. His small bowel protruded from his body through these wounds. All of Jason's injuries had occurred before death. The medical examiner testified that Jason had bled to death over a period of several minutes as a result of the multiple stab wounds.

The three victims had been dead at least twelve hours before they were found. There were no signs of forcible entry into the house. The back door had been left open. There were signs of a struggle in the house, particularly the kitchen, where a leg had been broken off the table. A .22 caliber cartridge was found on the rug in the den. An identical type of bullet was removed from the bodies of Judy and Chad who, ballistics experts determined, had been shot with the same gun. There were bullet holes in the walls of the front bedroom and the den. A path of splattered blood led from the den down the hall to the kitchen. Drops of blood in the bathroom indicated that someone had cleaned up in that room.

All of the evidence connecting the Defendant to the killings of his estranged wife and step children was circumstantial. The Defendant and Judy Smith were married on August 8, 1985. Frank Smith had two children by his first marriage, Laura, age 18, and Merl, a son age 15, who lived with the Defendant's parents in Pleasant View, Tennessee. In December of 1986, Judy and Frank had twin boys, Chris and Casey. In June of 1989, the Smiths separated and a divorce action was pending at the time of the murders. Judy Smith had been awarded temporary custody of the twins, with the Defendant receiving visitation every other weekend. A key issue in the divorce was which parent would receive custody of the twins.

There was testimony that Judy, Chad and Jason were afraid of the Defendant. In June 1989, the Defendant and Jason had gotten into a fight at the Defendant's trailer on his family's farm in Pleasant View. The Defendant had bitten Jason on the back and held a gun to his head. He had ordered Judy and the older boys out of the trailer and threatened to kill Judy if she tried to take the car or the twins or if she took out a warrant or notified the police. In August 1989, when Judy returned to the trailer to retrieve her clothes, the car and other items, the Defendant had tied her up, raped her, run a knife across her throat and told her he was going to kill her. At the time of the killings, warrants were pending charging the Defendant with aggravated assault based on these two incidents.

During the summer of 1989, the Defendant called Judy several times at the Waffle House restaurant where she worked and, according to a fellow employee who listened to the numerous phone calls at Judy's request, threatened to kill Judy. He told her he would shoot her and stab her. Once he threatened to kill Chad and Jason because "she was better to them than ... she was his

twins." The last of these calls occurred in August 1989.

When the Defendant was picking up the twins for visitation two or three weeks before the murders, the Defendant told Judy's father, "You tell Judy that I've been playing with her with kid gloves, but now the gloves are coming off." Another time he said that he would kill Judy if she ever left him.

One of the Defendant's co-workers at Maintenance Service Corporation in Lavergne testified that, in the early summer months of 1988, the Defendant offered to kill his wife if he would in turn kill Judy. Two weeks later the Defendant told his co-worker that they could plan the killings so that each man would be out of town when the other killed his wife. One month before Judy and her sons were killed, the Defendant asked another co-worker if he knew anyone who would kill the Defendant's family. Two weeks later the Defendant told the same co-worker that he would offer $20,000 to have someone kill Judy and his two stepsons. The Defendant specified that his twins were not to be killed.

When police first entered Judy Smith's house, they found a bloody palm print on the sheet beside Judy's body. A latent fingerprint examiner testified that it matched the palm print of the Defendant's left hand, which, like the print on the sheet, was missing the two middle fingers. Other circumstantial evidence connected the Defendant to the crime. A brown cotton work glove found in the front bedroom resembled gloves the Defendant used in his work. The Defendant also owned a .22 caliber revolver and was known to carry a large knife. He engaged in the craft of leatherworking, in which an awl is a basic tool used to punch holes or mark guidelines in leather. In March 1989, he had taken out a life insurance policy with American General on Judy for $20,000 and the boys for $10,000 each. In February of that same year, he had taken out a $20,000 policy on Judy and insured the boys for $5,000 each with Liberty National. He had earlier taken out a policy on Judy for $10,000 and the boys for $4,000 each with United Insurance. He thus was the beneficiary of $88,000 of life insurance on the lives of Judy and her two sons.

The Defendant testified that on October 1, 1989, he drove to Nashville and met Judy, Chad, Jason and the twins for breakfast at Shoney's restaurant. After breakfast, they went to the residence on Lutie Street, where Chad and Jason babysat the twins while he and Judy looked for a used car for Judy. That afternoon, the Defendant and Judy went to a Waffle House at I–40 and Charlotte Avenue and drank coffee there until about 5 p.m. They then ate dinner at the Gold Rush restaurant and later stopped for coffee at another Waffle House, located at I–24 and Harding Place, where they remained until 9:30 p.m. Subsequently, they returned to Judy's residence on Lutie Street. Chad and Jason came out to Defendant's car with the twins. He then drove the twins back to his home in Pleasant View, which is approximately 31 miles from Judy's home.

Judy called her sister about 10:30 p.m. and told her that Frank had taken the twins so that he could watch them the next day to give her time to look for a car. The son-in-law of Judy Smith's neighbor at 318 Lutie Street testified that he saw the Defendant's white LTD parked at Judy's house around 11:00 or 11:15 that night.

As part of his work as a machine tool repairman, the Defendant had to travel to Morehead, Kentucky, to work on a machine the next day. His employer had instructed him to leave on Monday morning, but he had requested instead that he be allowed to leave Sunday, stay overnight and then go to the customer's plant. Sometime during the early morning hours of Monday, October 2, he made the 260–300 mile trip to Morehead in his white LTD. He was at the customer's plant Monday morning, 8:00 EST, repaired the machine, and returned to Pleasant View that afternoon.

When picked up for an interview by law enforcement officers on the evening of October 2, the Defendant never asked why he was being questioned and spoke of his wife in the past tense before he was told of her death. The Defendant told officers that he had gone out with Judy on Sunday to look for a car and claimed they were getting back

together. He said he left Nashville with the twins around 9:00–9:30 p.m., arrived at his mother's house sometime between 10:00 and 10:30 p.m. and left there at approximately 10:30 p.m. to drive to Kentucky. When told what had happened to his wife and stepchildren, he asked no questions about the circumstances of their deaths and displayed little emotion. The officers noticed he had some abrasions on his hand, elbow, back and shoulder blade.

The Defendant presented an alibi defense through his testimony and that of his family. He and his witnesses testified that he had been at his home in Pleasant View from 10:00 until 11:15 p.m., when he drove directly to Morehead, Kentucky. He had suffered the abrasions when his dog had jumped on him upon his return home Monday afternoon. The Defendant denied committing the murders, threatening his wife or assaulting Judy and Jason. He claimed he was being framed and insisted that he and his wife had been reconciling. The Defendant and his witnesses denied that he owned an awl, a .22 caliber revolver, or a knife large enough to have caused the victims' wounds. He denied trying to hire someone to kill his wife. He had no idea how the bloody palm print, missing two fingers just like his own hand and identified by an expert as his print, came to be on the sheet next to his wife's body. He denied that he was at Judy Smith's residence on Lutie Street at 11:22 p.m. on October 1, 1989.

It was the State's theory that the Defendant planned the homicides of his wife and stepsons. He had left the twins with his mother around 10:30 p.m., made the thirty minute drive back to his wife's home, committed the killings and then driven to Morehead, Kentucky. The jury obviously did not accept the Defendant's alibi defense and found the Defendant guilty of three counts of premeditated first degree murder.

At the sentencing hearing the State presented the records of the three murder convictions, photographs of the bodies of Chad and Jason Burnett, and the testimony of the assistant Davidson County Medical Examiner concerning the suffering of the victims.

The Defendant presented personnel and an inmate from the Davidson County Jail, where he had been incarcerated since his arrest, to testify that he had been a good prisoner. Several of his co-workers testified that he was a good employee. His mother and his daughter from a previous marriage testified about his character and the fact he had a severely retarded teenage son who depended emotionally on him. There was evidence that the Defendant had suffered a "nervous breakdown" while on a business trip to Utah at some time in the past and that he had been hospitalized for depression in April 1983. The psychiatrist who had treated him at the time testified that he exhibited symptoms of paranoia or hypervigilance and had an adjustment reaction.

Dr. Gillian Blair, a clinical psychologist, had evaluated the Defendant in November 1989. She diagnosed him as suffering from a paranoid personality disorder, chronic depressive neurosis and a paranoid delusional disorder. She described his family as dysfunctional. His father was a diagnosed paranoid schizophrenic. Dr. Blair felt that the Defendant would pose no danger in the highly structured environment of prison.

In rebuttal, the State presented the testimony of Dr. Leonard Morgan, a clinical psychologist from the Dede Wallace Center who had examined the Defendant to determine his competency to stand trial. Dr. Morgan opined that the Defendant was not suffering from any mental illness, only personality disorder, and was not delusional. He stated that the Defendant had told him he did not want to use an insanity defense because he would have trouble later getting a home loan.

## I.

The Defendant asserts that the evidence was insufficient to support his convictions. When the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see* Tenn.R.App.P. 13(e). A jury verdict approved by the trial judge

accredits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977).

 The Defendant argues that he was convicted solely on circumstantial evidence. A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *State v. Williams*, 657 S.W.2d 405 (Tenn.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Crawford*, 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971).

 The jury failed to believe Defendant's alibi story that he was leaving Pleasant View, Tennessee, almost 31 miles away from the victim's residence, when the 911 call was made. They chose instead to believe a disinterested witness who identified the Defendant's car in Judy Smith's driveway around 11:00 or 11:15 the night of the murder. The testimony accredited by the jury in this case clearly establishes the Defendant's presence at Judy Smith's residence at 324 Lutie Street at the time of the murder. Witnesses identified voices on the 911 emergency call at 11:22 p.m. as that of Jason Burnett crying "Help me!" and that of his older brother Chad shouting "Frank, no. God help me!" The call ended abruptly with Jason stating "324 Lutie Street." The Defendant's bloody palm print was found on the sheet next to Judy Smith's body. The evidence also clearly es-

tablished that the Defendant had threatened the victims prior to the murders. We find the Defendant's challenge to the sufficiency of the evidence to be without merit.

## II.

The Defendant next avers that the statement he made to the police on the evening of October 2, 1989, should have been suppressed by the trial court. He submits that the statement should have been suppressed because the officers failed to advise him of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court held that *Miranda* did not apply because the Defendant was not in custody and the officers were making only a general preliminary investigation.

During the early investigation of the offense on the afternoon of October 2, 1989, Detective Mike Smith of the Metropolitan Police Department was ordered to travel to Robertson County to find the Defendant in order to ascertain the location of the twins and obtain possible information about Judy Smith's activities over the past few days. The Metropolitan Police Department called the Robertson County Sheriff's Department and informed Detective Don Bennett that they were investigating a homicide in Davidson County and trying to locate Oscar Smith and his two young children. Around 4:30–5:00 p.m., Bennett and two other officers drove to Smith's home, where they saw Smith and his family standing in the front yard.

Upon verifying that the twins were with the Defendant, Detective Bennett informed him that Metro officers were coming to Springfield to talk with him and requested the Defendant ride with him to the interstate a short distance away to talk with the Nashville police. Bennett told the Defendant "on the front end" that he was not under arrest and that the officers "needed to talk with him." Bennett testified that, if the Defendant had refused to accompany him, he would have been allowed to go. At his suppression hearing the Defendant acknowledged that he knew he was not under arrest or in custody at this time. He cooperated

and voluntarily got into the back of one of the sheriff's cars.

The officers and the Defendant drove to the intersection of Highway 49 and I–24, where at 7:10 p.m. they met Detectives E.J. Bernard and Mike Smith. It was decided the Metro officers would talk with Defendant at the offices of the Detective Division of the Sheriff's Department in Springfield. Detectives Bennett and Smith testified that, when asked, the Defendant agreed to talk with the officers in Springfield rather than at the interchange. Defendant denied he had any part in this decision.

The officers and the Defendant arrived at the Detective Division around 7:25 p.m., and the Defendant was interviewed by Smith and Bernard in one of the private offices. Detective Smith testified that he did not give the Defendant his Miranda warnings because "he wasn't in custody at the time." Smith testified that the Defendant was not a suspect, that he was only being interviewed to verify the whereabouts of himself and his twins, and that, if he had asked at any time to leave, he would have been taken home. The Defendant was calm and cooperative and agreed to talk with the officers, who spoke with him for about thirty-five minutes, obtaining general information about Judy Smith, the Defendant and the twins. During this time, the Defendant signed a form giving his consent to officers to search his house and vehicle. The detectives did not inform the Defendant of the deaths of his wife and stepsons until late in the interview. Questioning was terminated when the Defendant asked to talk with an attorney. He was allowed to return home at that time, which was about 8:30 p.m. The Defendant was not charged with the crime until November 6, 1989, over a month after the interview took place.

The Defendant testified that he felt he had no choice whether to get into the police car, to go to the interstate or to go to the sheriff's offices in Springfield. He admitted he knew he was not under arrest, wanted to cooperate with the officers and was not coerced in any way.

█ This Court is bound by the trial court's determination that the Defendant was not in custody at the time of questioning unless it "clearly appear[s] that there ha[s] been an abuse of discretion and a violation of the rights of the accused." *Childs v. State,* 584 S.W.2d 783, 788 (Tenn.1979); *State v. Furlough,* 797 S.W.2d 631, 639 (Tenn.Crim. App.1990); *State v. Nakdimen,* 735 S.W.2d 799, 802 (Tenn.Crim.App.1987). There is a "hairline of distinction" between the investigatory and the accusatory or custodial stage. *Childs v. State,* 584 S.W.2d at 788, *State v. Morris,* 224 Tenn. 437, 456 S.W.2d 840, 842 (1970). Whether one is in custody turns not on whether the interrogation occurred in a "coercive environment" but on whether the accused was "deprived of his freedom of action in any significant way." *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Under *California v. Beheler,* 463 U.S. 1121, 1125, 1126, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983), the ultimate inquiry to determine whether a person is "in custody" for purposes of receiving *Miranda* protection is "simply whether there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest."

█ Under the principles of *Mathiason* and *Beheler* and the totality of the circumstances test of *State v. Morris,* 456 S.W.2d at 842, the trial court did not err in refusing to suppress the Defendant's statement. While the Defendant was transported to police headquarters and questioned apart from his family, this was done for the convenience and safety of the investigating officers. (Detective Bennett explained that from previous experiences the sheriff's officers knew that the Defendant was potentially dangerous and heavily armed and that they felt it would be safer to talk with him away from his home.) The Defendant knew that he was free to go at any time, wanted to cooperate, went willingly with the police, gave a voluntary (and exculpatory) statement, and was allowed to go when he asserted his rights. The interview occurred early in the investigation, shortly after the victims were found, when the police were still asking general questions and sorting out the victims' activities prior to their deaths. The detectives testified that the Defendant was not a suspect. The deci-

sion of the trial judge that the Defendant was not in custody for purposes of *Miranda* is not in error.

█ The Defendant's second argument against the admission of his statement is that Detective Bernard, rather than Detective Smith, who was the only one of the two interrogating officers to testify at the suppression hearing, testified for the State at trial regarding the substance of Defendant's statement. On appeal, the Defendant argues that the testimony of Detective Bernard that he was watching the Defendant "to make sure that either he didn't try to leave or run away" during a break in the interrogation establishes that the Defendant was in custody when the statements were given without prior *Miranda* rights. At trial, however, the Defendant's objection to Detective Bernard's testimony was based on the theory that Bernard was testifying to a statement other than that described by Detective Smith at the suppression hearing. It is apparent that this theory is mistaken and that the Defendant was trying to limit the State's witnesses to those presented at the suppression hearing. The trial court did not err in allowing Detective Bernard to testify about the circumstances of the statement. The Defendant never renewed his objection to the admissibility of the statement under *Miranda* based on Bernard's testimony.

Furthermore, the testimony of Detective Bernard, when taken in context, does not clearly demonstrate that the trial court abused its discretion and that the Defendant's rights were violated. Bernard's remarks that he was afraid the Defendant might leave because he had just learned his wife was dead are subject to various interpretations. The record shows that Bernard was not guarding the Defendant but standing some distance away. We do not find that the trial court erred in refusing to suppress Bernard's testimony, nor does the substance of his testimony reveal plain error in the court's earlier ruling concerning the circumstances of the statement.

## III.

The Defendant next asserts that the trial court erred in denying his motion to suppress evidence obtained during a search of his residence. On October 13, 1991, law enforcement authorities conducted a search of the Defendant's residence pursuant to a search warrant. Several items taken during the search were admitted into evidence at trial, including a holster, a live .22 caliber cartridge and assorted leatherworking tools. The Defendant contends that the trial court should have suppressed the evidence obtained as a result of this search because it violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. The Defendant presents three reasons why the search was constitutionally invalid.

First, the Defendant says the affidavit supporting the search warrant failed to establish probable cause because it did not establish a nexus between the crimes, the evidence sought and the place to be searched.[2] The information deemed insufficient by the Defendant is incorporated into the affidavit, dated October 13, 1989. It states that the Defendant had become a prime suspect as the result of the police investigation beginning October 2, 1989, because he had admitted being with the victims the night of the offense and there was a history of domestic violence between the Defendant and the victims. After leaving the victims, the affidavit states, the Defendant had returned to the place to be searched (his and his parents' residences); and the murder weapons (a .22 calibre gun, a large blade knife, and an ice pick-type weapon) as well as personal papers of Judy Smith were missing from the scene of the crime. The police had a description of the clothing worn by the Defendant the night of the killings. It was further stated that on October 6, 1989, law enforcement officers had observed the residence to be searched and

---

2. The Court of Criminal Appeals rejected a similar challenge by the Defendant's parents to a search warrant issued for a search of their residence on an almost identical statement of proba-

ble cause. *See State v. Florence Smith and Oscar E. Smith,* 1991 WL 201629 (Tenn.Crim.App., Nashville, 10–10–91) (*app. denied* 2–24–92).

noticed it was used for storage by the Defendant and his parents.

An affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched. *Zurcher v. Stanford Daily,* 436 U.S. 547, 555–558, 98 S.Ct. 1970, 1976–1977, 56 L.Ed.2d 525 (1978); *see generally* W. LaFave, 2 *Search and Seizure* § 3.7(d), pp. 102–111 (2d ed. 1987). The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence. *United States v. Jacobs,* 715 F.2d 1343, 1346 (9th Cir.1983).

> Where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police. Other instrumentalities are also likely to be in the offender's home, especially when there is reason to believe he would make use of them there.

La Fave, *supra,* § 3.7(d) pp. 108–109.

In the case at bar, the Defendant had informed police that, after leaving the victims, he had gone directly to his trailer and his parents' home located nearby, then left for Kentucky. The items being sought, murder weapons such as a gun and ice pick/awl, clothing worn the night of the killing, divorce papers, etc., were of the type kept at one's residence. It was reasonable to conclude that personal items such as these would have been left at Defendant's trailer and would remain there. *See United States v. Jacobs,* 715 F.2d at 1346; *United States v. Steeves,* 525 F.2d 33, 38 (8th Cir.1975).

Second, the Defendant asserts the search warrant failed to describe the person and place to be searched with sufficient particularity. The specific defects of which Defendant complains are (1) that the warrant listed his address as 3535 Cooper–Nicholson Road when it is 3533 Cooper–Nicholson Road and (2) that his father's birth date is given after his name on the search warrant. The requirement of particular description of the place to be searched is met by a description which particularly points to a definitely ascertainable place so as to exclude all others, and enables the officer to locate the place to be searched with reasonable certainty without leaving it to his discretion. *Hatchett v. State,* 208 Tenn. 399, 346 S.W.2d 258, 259 (Tenn.1961); *State v. Cannon,* 634 S.W.2d 648, 650 (Tenn.Crim.App. 1982). Neither of the two alleged defects prevents satisfaction of this test by the warrant in this case.

At the hearing on the motion to suppress, the proof showed that the house of the Defendant's parents, his sister's trailer and his trailer were all located on the same property. A common driveway enters the property from the main road and connects the Defendant's trailer and his parents' house, which are about 50 to 60 yards apart. Officers testified that they looked at the property before getting the warrant and that only one mailbox with the number 3535 stood at its entrance. The Defendant's proof showed that there were two mailboxes on the road, one marked 3535, the other 3533, and that 3533 was the Defendant's address. The search warrant described the Defendant's trailer in detail. Any inaccuracy in the address did not invalidate the warrant since the overall description of the premises contained in the warrant enabled the police to locate the place to be searched with reasonable certainty. *See State v. Wright,* 618 S.W.2d 310, 318 (Tenn.Crim.App.1981).

Likewise, the erroneous birth date following the Defendant's full and correct name did not render the description ambiguous. Detective Pridemore testified at the suppression hearing that the officers corrected this clerical error on the original of the warrant when it was discovered at the commissioner's office in Robertson County at the time the warrants were being obtained.

The Defendant's concluding argument is that the search warrant was invalidated because Detective Pridemore of the Metropolitan Nashville Police Department had no authority to execute the warrant in Robertson County. T.R.Cr.P. 41(c) requires

that a search warrant be "directed to and served by the sheriff or any deputy sheriff of the county wherein issued, any constable, or any other peace officer with authority in the county." When the warrant was obtained and executed, Detective Pridemore was accompanied by Deputy Groves of the Robertson County Sheriff's Department. The warrant itself is addressed "[t]o any Peace Officer within or of said County [Robertson County]." The Judicial Commissioner certified that the warrant was delivered for execution to Pridemore; however, Groves executed the return on the warrant. Pridemore's participation in procuring the warrant and executing it does not invalidate the warrant. *See State v. Pigford,* 572 S.W.2d 921 (Tenn.1978) (issuance of warrant to federal officer and his participation in its execution did not invalidate warrant so long as it met all statutory requirements); *State v. Robinson,* 622 S.W.2d 62, 75 (Tenn.Crim.App.1981). We are of the opinion that the trial court correctly held that the search warrant was validly executed.

IV.

The Defendant contends that the trial court erred in admitting testimony regarding the victim's fear of the Defendant. Don Robirds, Judy Smith's father; Teresa Zastrow, her sister; and Billy Fields, her friend, testified over objection that Judy Smith had "expressed fear" of the Defendant during their separation. At trial the Defendant objected to this testimony on hearsay grounds, and the trial court ruled the statements admissible under the "state of mind" hearsay exception in Rule 803(3), Tennessee Rules of Evidence. On appeal the Defendant asserts primarily that evidence that the victim was afraid of the Defendant is not relevant and, if so, its relevance was outweighed by its prejudicial effect. *See* Tenn.R.Evid. 401 and 403.

While the evidence was admissible to show the declarant's state of mind, i.e., that the victim was afraid of the Defendant or had expressed fear of the Defendant during the period of the couple's separation, Judy Smith's state of mind was not directly probative on the issue of whether the Defendant had murdered her and her sons. The Defen-

dant distinguishes *State v. Cravens,* 764 S.W.2d 754, 755 (Tenn.1989), the case relied upon by the trial court in admitting these statements, by noting that in *Cravens,* the Defendant had raised the issues of self-defense and justifiable homicide in opening statements. This made the victim's fear of the Defendant prior to the killing relevant on those issues.

The State points out in this case that the Defendant asserted that he and the victim were in the process of reconciling at the time of her death thus attempting to indicate that he had no motive for murdering her. The State therefore argues that the victim's expressions of fear of the Defendant would be relevant rebuttal on that issue. The problem with this argument is that the issue of reconciliation had not yet been raised by the Defendant in opening statement or on examination. Defendant's cross-examination on this issue during the State's case in chief may have been a response to this testimony rather than vice versa. However, the Defendant's statement to police on October 2 had mentioned that he and his wife were reconciling, and testimony of the victim's fear was relevant to reveal the falsehood in this statement.

In any event, any error in the admission of this evidence is harmless beyond a reasonable doubt in light of the proof in this case. T.R.A.P. 36(b); Tenn.R.Crim.P. 52(a). When one considers the proof of Defendant's previous threats and violent assaults upon the victims, that Judy Smith would have been afraid of the Defendant is obvious.

V.

The Defendant next alleges that the trial court erred in admitting the victims' statements to Judy Smith's sister about the Defendant's previous assaults against Judy and Jason. Teresa Zastrow, Judy's sister, testified that on the day Judy and the Defendant separated, Chad called and asked her to drive to the Defendant's trailer to pick up himself, Jason and Judy. Teresa responded to the call and found Judy and her two sons walking down the road about one mile from the trailer. She described them as "nervous to the point of hysterical, all of them talking

at once." After Teresa had calmed Judy down enough to talk, Judy told her sister that she and the Defendant had argued and that Jason and the Defendant had gotten into a fight. The Defendant had kicked Jason's legs, tried to kick him in the groin and bitten him on the back. He had ordered them to leave and put a gun to Jason's head. Once they were outside, he had shot the gun into the air and again ordered them to leave. He threatened Judy that, if she tried to get the car or the twins or if she took out a warrant or brought the police "up there," he would kill her and her sons.

Later, Teresa testified that in August, 1989 her sister had returned to the trailer. When she saw her afterwards, Judy was "very confused, in shock" and "so flat it was … hard to explain how she was." Teresa saw rope burns on Judy's wrists and a red mark on her throat. Judy told her that she had gone with the Defendant to the trailer to get her car and some other items. While she was there, the Defendant tied her up by the wrists and neck, raped her, ran a knife across her throat, and said he was going to kill her.

The Defendant contends that this evidence was inadmissible hearsay, irrelevant and prejudicial, and an improper reference to other crimes in violation of Tenn.R.Evid. 404(b). The trial court admitted both statements as excited utterances under Tenn. R.Evid. 803(2). Both fall under that exception to the hearsay rule inasmuch as they relate to "a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn.R.Evid. 803(2); *see generally* Cohen, Paine & Sheppeard, *Tennessee Law of Evidence* § 803.(2).1 *et seq.* (2d ed. 1990). The proof does not support the Defendant's argument that Judy Smith was not under "the stress of excitement" when the statements were made because she had calmed down enough to talk when she made the first statement and her demeanor was "flat" at the time of the second statement. Considering the interval between the "startling events" and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook and circumstances of the de-

clarant, *see* Cohen, *Tenn. Law of Evidence, supra* § 803(2).2, the trial court did not err in concluding that the declarant was under "the stress of excitement" at the time the statement was made.

■ In response to the Defendant's assertions that the evidence of the two episodes was irrelevant and inadmissible under Tenn. R.Evid. 404(b), the State cites a line of cases, *see, e.g., State v. Turnbill,* 640 S.W.2d 40, 46–47 (Tenn.Crim.App.1982); and *State v. Glebock,* 616 S.W.2d 897, 905–906 (Tenn.Crim. App.1981), which hold that violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. Also, in the present case, the victims, despite the Defendant's threats to kill them if they did so, had filed charges against the Defendant based on these prior assaults. The evidence of these violent episodes was admitted not to prove the Defendant acted in accord with this character but as part of the proof establishing his motive for the killings. The probative value of this evidence is not outweighed by the danger of unfair prejudice. *See* Tenn.R.Evid. 404(b)(3); *see generally* 4 Am.Jur.2d *Homicide* § 274 (1968); 41 C.J.S. *Homicide* § 206 (1991).

## VI.

■ The Defendant next objects to the testimony of Billy Fields, Judy Smith's boyfriend, that Judy had told him not to come by her house on Sunday because she was afraid his being there "might cause a conflict." The trial court admitted the hearsay apparently because it had "to do with matters that we've already considered." The State avers the statement was admissible under the "state of mind" hearsay exception in Tenn.R.Evid. 803(3). The Defendant argues relevance and prejudice under Tenn.R.Evid. 401 and 403. We find the statement was admissible and relevant to show Judy's plans for Sunday, the day she was killed and to explain why Fields did not see her that day. *See* Tenn.R.Evid. 803(3) and Advisory Commission Comments. To the extent it might have been used im-

properly to establish the Defendant's conduct on Sunday, *see* Advisory Commission Comments, *supra,* the record is full of other testimony, including that of the Defendant, that he and Judy Smith were together that day and that he went to her house with the twins. We find no reversible error.

## VII.

■ The Defendant next argues that the trial court erred in admitting evidence of Judy Smith's statements to Sheila Gunther regarding Judy's future plans and Gunther's testimony that Defendant threatened the victims. Sheila Gunther was Judy Smith's co-worker at the Waffle House and she testified that, before she quit working at the restaurant in August 1989, Judy told her that if she ever got a divorce from the Defendant she would take all her children, including the twins, and leave and that the Defendant would never find her again. The trial court held this admissible as going to Judy Smith's state of mind under Tenn.R.Evid. 803(3). The Defendant contends that Smith's state of mind, i.e., her intent to leave Nashville after the divorce was final, was irrelevant to the present case and, if relevant, prejudicial. There is no indication that Judy had conveyed her intentions to the Defendant, but the record shows that the custody of the twins was a major issue in the divorce. Judy's intent to hide the twins from the Defendant after the divorce would be relevant as to motive if Defendant knew of her plans. *Cf. State v. Coker,* 746 S.W.2d 167, 173 (Tenn.1987). In any event, we find that any error in admitting this piece of evidence was harmless. T.R.A.P. 36(b); T.R.Cr.P. 52(a).

■ Gunther also testified that at Judy Smith's request she listened to several telephone conversations between the Defendant and Judy during the summer of 1989. In at least *twelve* of these calls, the Defendant threatened to kill Judy, Chad and Jason. The Defendant submits that this evidence is too remote in time to the murders to be relevant and, if relevant, is prejudicial. The Defendant's threats against the victims are clearly relevant to show malice, premeditation and the Defendant's state of mind; the objection based on remoteness affects only the weight, not the admissibility of the evidence. *See generally,* 41 C.J.S. *Homicide* § 204 (1991); *Wharton's Criminal Evidence* § 201 (13th ed. 1972).

## VIII.

■ The Defendant avers that the trial court abused its discretion in admitting photographs of the victims at the guilt-innocence phase of the trial. The Defendant argues that the prejudicial effect of the admission of the photographs at the guilt phase outweighs their probative value and that the photographs therefore should have been excluded under Tenn.R.Evid. 403 and *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978). The Defendant complains of the admission of two sets of photographs. The first show the bodies of Judy Smith and Chad Burnett as they were found at the scene. The two photographs containing Judy's body show the bloody hand print as it was found on the sheet and its location in relation to the body and the bed. This, the State avers, was important proof because it directly ties the Defendant, not only to the scene of the crime, but since the print is in blood, to the murder of the victims. The photographs of the kitchen showing Chad's body, while more gruesome than those of the bed and Judy's body, were probative to show the violence of the struggle and the assault on Chad, the broken table, and the bloody footprint on the wall. The State, during the guilt phase, only sought to admit four out of 15 photographs. They did not seek to admit any photographs of Jason Burnett, who was found with his intestines protruding from his stomach. We agree with the trial court that the probative value of these four photographs is not substantially outweighed by the danger of unfair prejudice under Tenn.R.Evid. 403 or *Banks.*

■ The second set of photographs of which the Defendant complains were taken at the morgue and were used to illustrate the testimony of Dr. Harlan, the medical examiner. Dr. Harlan testified at the jury-out hearing that the photographs would assist her in explaining the victim's injuries. Dr. Harlan's testimony was very complicated in that there were three different types of wounds on two

of the victims because three different weapons were used. The photographs, which are in color, show the various individual wounds on the bodies of the victims after they were cleaned. They illustrate the testimony of Dr. Harlan. The trial court ruled that the probative value exceeded the prejudicial effect. The court also stated "that they also go to premeditation, malice and intent because of the obvious multiplicity of these wounds and an obvious intent of whoever was inflicting these wounds."

The trial court applied the rule this Court set out in *State v. Banks, supra*, and correctly weighed the probative value of the evidence against its possible prejudicial effect. A trial court has broad discretion in determining whether such evidence should be admitted. *State v. Melson*, 638 S.W.2d 342, 365 (Tenn.1982). Here, the trial court did not abuse its discretion and we find no error.

## IX.

The Defendant next objects to the admission by the trial court of any testimony by Sgt. Johnny Hunter, a certified latent fingerprint examiner, regarding the "alternate light source technique" used to identify the palm print found on the sheet beside Judy Smith's body. Sgt. Hunter testified that the bloody palm print found on the sheet belonged to the Defendant. The Defendant contends that the "alternate light source" does not conform to generally accepted scientific theory and is inadmissible under Tenn. R.Evid. 703 and that Hunter is not a qualified expert in this technique under Tenn. R.Evid. 702.

The "alternate light source" is a machine that transmits the light from a very bright light bulb through an optic fiber tube to illuminate an object. It uses different filters to change the wave length of the light so that the features of a fingerprint, such as the ridges, are enhanced against the background and made clearer. The machine does not touch the print, "lift" it or alter it in any way. In Sgt. Hunter's words, it is "just a very bright light bulb that is shined through filters." Hunter used the light when he took a photograph of the print and then used the photograph to match the prints by means of

the traditional techniques of comparison. Hunter had been trained by the manufacturer in how to use the machine. Although Hunter had used the machine "thousands of times" to examine prints, this was the first time he had testified in court on an identification assisted by alternate light source and the first time he had used the light to enhance a print in blood.

Although the Defendant tries to characterize the alternate light source as a new and unique area of scientific expertise, it is apparent from the record that the machine is simply a tool, used by an examiner to make a fingerprint clearer for examination and comparison. The Defendant contends the light source was not trustworthy. Tenn.R.Evid. 703 provides that a "court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." The underlying facts in this case do not render Sgt. Hunter's testimony untrustworthy or indicate in any way that the alternate light source is unreliable. The Defendant admits, and the record establishes, that Sgt. Hunter is an expert in the area of latent print comparison and blood stain analysis and had been trained in the use of the alternate light source machine. Traditional fingerprint analysis, i.e., comparison of ridges, whorls, and other identifying marks, was used to establish that the palm print was the Defendant's. The trial court did not err under Tenn.R.Evid. 702 and 703 when it allowed Sgt. Hunter to testify as an expert based upon his use of the alternate light source.

## X.

The Defendant argues that the tape recording of the 911 call from the victims' residence on October 1, 1989, at 11:22 p.m., and the transcript of the recording, were inadmissible hearsay. The State argues both were admissible under the excited utterance exception to the hearsay rule, Tenn.R.Evid. 803(2), and the trial court admitted them as part of the *res gestae*, an obsolete term often inaccurately applied to excited utterances. *See* Cohen, Paine & Sheppeard, *Tenn. Law of Evidence* § 803(2).1, p. 412 (2d ed. 1990). The Tennessee Rules of Evidence contain no

"*res gestae*" provision. The Defendant avers that *Montesi v. State,* 417 S.W.2d 554 (Tenn. 1967), requires that the testifying witness must have seen the declarant make the excited utterance for the statement to be admissible.

■ The Defendant's reliance on *Montesi* is misplaced. First, this case was tried under the new Rules of Evidence, which have no such requirement. *See* Tenn.R.Evid. 803(2). Furthermore, we do not read *Montesi* as holding that the testifying witness must have observed the declarant make the excited utterance but that, when the declarant is a bystander, rather than a participant or actor in the startling event, the bystander-declarant must have observed the event to which his declarations relate. In the present case the declarants are Chad and Jason Burnett, who were clearly participants in the startling event. *Montesi* states no requirement that the person testifying to the hearsay must have actually seen, as opposed to heard, the declarant as he or she made the statement.

■ The Defendant also submits that the tape's probative value was outweighed by the danger of unfair prejudice. He cites the case of *State v. Pendergrass,* 179 Mont. 106, 586 P.2d 691 (1978), in support of his position. In that case, the prejudicial danger of a tape recording of an hysterical emergency call by a rape victim was held to outweigh the tape's probative value, which was simply to bolster the already overwhelming evidence that a rape had occurred, something the defendant did not dispute. In the present case the tape contains a statement by one of the victims in which he says the Defendant's name as he is being attacked, one of the two most probative pieces of evidence establishing the Defendant's identity as the killer. The court did not err in finding that the probative value of the tape outweighed any prejudicial danger.

■ Finally, the Defendant argues that the court should not have allowed the jury to use a transcript of the recording. First, he says that, since the content of the tape was in dispute, the transcript which purported to accurately represent it should not have been admissible. The tape had been electronically enhanced by the F.B.I. The 911 operator who took the call testified that she heard only screaming and not the words "Frank, no. God help me," when she took the call. She testified she had heard Chad's words clearly only after the tape had been enhanced. The operator also testified that the transcript was an accurate reproduction of the tape as enhanced. Barbara Kohus, an F.B.I. signal processor, testified concerning the procedure used to enhance the tape and the fact that the process does not change the words but only reduces noise so that the voices can be heard more easily.

Defendant also complains that the use of exclamation points in the transcript prejudiced him and that the transcript preconditioned the jurors to accept the transcript's version of the tapes. Before playing the tape and giving the jury the transcript, the court fully instructed the jury that the tape, not the transcript, was the evidence in the case and that if any discrepancies were found between the two, they were to "rely upon [their] hearing and . . . understanding of the tape and disregard portions of the transcript that [they found] to be inaccurate." The trial court did not err in admitting the tape recording and allowing the jury to use a transcript. *See, e.g., State v. Coker,* 746 S.W.2d 167, 172 (Tenn.1987); *State v. Jones,* 598 S.W.2d 209, 223 (Tenn.1980); *State v. Mosher,* 755 S.W.2d 464, 469 (Tenn.Crim.App. 1988); *State v. Elrod,* 721 S.W.2d 820, 822–823 (Tenn.Crim.App.1986); *State v. Smith,* 656 S.W.2d 882, 887–888 (Tenn.Crim.App. 1983); *see also* Tenn.R.Evid. 1001–1008.

### XI.

■ The Defendant avers that the trial court erred in admitting evidence the Defendant had been charged with the aggravated assaults of two of the victims. The administrator of the General Sessions Court of Robertson County testified that two warrants charging the Defendant with aggravated assault had been pending on October 1, 1989. The first had been issued June 17, 1989, and alleged the aggravated assault of Judy Smith's thirteen-year-old son Jason Burnett. The second, issued August 1, 1989, charged the aggravated assault of Judy Smith. The

court date in both cases had been set for October 30, 1989. Both were dismissed that day because the prosecutor was deceased. The trial court admitted this evidence over Defendant's objections as relevant to the Defendant's motive and intent.

The Defendant asserts that this evidence was irrelevant and, if relevant, was substantially more prejudicial than probative. The trial court correctly held that evidence of the outstanding warrants was relevant as to motive and intent, *see State v. Teague*, 645 S.W.2d 392, 397 (Tenn.1983), and did not err in finding that the danger of unfair prejudice did not outweigh its probative value. *See* Tenn.R.Evid. 404(b).

Finally, the Defendant argues that this proof should not have been admitted because the prior crimes were not established by "clear and convincing evidence" under the guidelines of *State v. Parton*, 694 S.W.2d 299 (Tenn.1985). Strictly speaking, the evidence of which Defendant complains is not "other crimes evidence" as discussed in *Parton.* The relevant fact was that the charges were pending, and exposed the Defendant, who knew of them, to possible prosecution and punishment regardless of their validity. Proof establishing the charges' truthfulness might have been relevant to increase the strength of the State's theory that avoiding prosecution and conviction was the Defendant's motive but was unnecessary to establish the admissibility of the outstanding warrants.

### XII.

■ The Defendant also avers that the trial court erred in admitting evidence that the Defendant had attempted to solicit others to kill the victims. The Defendant complains of the testimony of two of his co-workers. The first, Raymond Merritt, testified that during the month before the murders the Defendant asked him if he knew of anyone the Defendant could hire to kill his family and told Merritt that he would pay $20,000 to have his wife and step-children killed. The second witness, Jerry Williams, testified that in the late spring or early summer of 1988, the Defendant offered to kill Williams' wife if Williams would kill the Defendant's wife.

The Defendant contends this evidence is inadmissible as irrelevant and, if relevant, as prejudicial beyond its probative value under Tenn.R.Evid. 404(b), governing the admission of evidence of other crimes or bad acts. We find that the evidence offered by both witnesses is relevant to establish intent, deliberation and premeditation.

### XIII.

■ The Defendant next alleges that the trial court erred in admitting an alleged comment made by him concerning the "McDonald's Massacre" in California. Clinton Curtis was an employee of Seal Master, the business in Morehead, Kentucky, where the Defendant repaired a machine on the morning following the murders. Curtis was allowed to testify that during a break that morning around nine o'clock he and the Defendant were discussing the issue of banning automatic weapons. Curtis remarked that one reason for such a ban was incidents like that in California where a man shot a number of people in a McDonald's restaurant. The Defendant remarked in response "that you never know when one of us could snap and do something like that."

The Defendant says that this evidence was both irrelevant and prejudicial under Tenn.R.Evid. 401 and 403. The trial court felt the statement was relevant as going to the Defendant's response to a conversation concerning "a number of people being killed" nine hours after the State alleged he had killed three people. The weight of the statement would be a matter for the jury. The State argues that the Defendant's comment about a mass murder within such a short period of time after the commission of the murders was relevant.

The evidence has only slight probative value under Rule 401, but unfair prejudicial dangers from its admission are also minimal. Clearly, any error in the admission of this single statement would be harmless under T.R.A.P. 36(b) and T.R.Cr.P. 52(a).

### XIV.

The Defendant next contends that the trial court erred in allowing the State to cross-

examine the Defendant about his prior employment in a meat packing plant. Over objection the State was permitted to ask the Defendant about his previous employment in the processing room or killing room of a meat packing plant in Nashville. There he had cut off the usable parts of animals and placed them on a conveyor belt to be sent to another room to be made into sausage. He testified that he was responsible for separating the diaphragm, liver, and kidneys and acknowledged that he dealt with the intestinal parts and stomach contents of the animals.

■ The Defendant says that this evidence was irrelevant and prejudicial. The evidence was relevant because Jason's intestines had been pulled from his body. Establishing that the Defendant had had a prior job removing intestines helped connect the Defendant to the crime.

■ The Defendant complains that the State was allowed to refer to the processing room as "the killing room." The State used this phrase only once in the initial questioning; and, after the Defendant informed the examining prosecutor that the room was called the processing room, the term was not used again. Other than the Defendant's remarks, the record does not reveal the correct name of the room; but any prejudice caused by the use of this phrase on one occasion in the context of the total examination and the description of the Defendant's duties would be harmless. *See* T.R.A.P. 36(b); T.R.Cr.P. 52(a).

### PENALTY/SENTENCING PHASE

### XV.

■ The Defendant complains of the admission during the sentencing phase of two color photographs of Jason and Chad Burnett's bodies as they were found by the police. The trial court held the photos were relevant to aggravating circumstance (i)(5), the murders "were especially heinous, atrocious or cruel in that [they] involved torture

or depravity of mind." T.C.A. § 39–2–203(i)(5) (1982) [now § 39–13–204(i)(5) (1991) ]. The Defendant argues that the probative value of these photographs was outweighed by the danger of unfair prejudice.

Photographs of the victim of a first degree murder have been previously admitted at the sentencing hearing in several capital cases where they are relevant to establish circumstance (i)(5). *See, e.g., State v. Payne,* 791 S.W.2d 10, 19–20 (Tenn.1990) (videotape); *State v. Miller,* 771 S.W.2d 401, 403–404 (Tenn.1989); *State v. Porterfield,* 746 S.W.2d 441, 449–450 (Tenn.1988); *State v. McNish,* 727 S.W.2d 490, 494–495 (Tenn.1987).

Both photographs are undeniably gruesome; however, we are of the opinion that the trial court did not err in admitting the photographs, which reflect directly upon the issues of torture and depravity. The photograph of Jason Burnett reveals the full extent of the abdominal wounds and illustrates the mistreatment suffered by the victim. The photograph of Chad Burnett shows the multiplicity and viciousness of the wounds inflicted upon him. Their probative value was not substantially outweighed by the danger of unfair prejudice. *See, e.g., State v. Payne,* 791 S.W.2d at 19–20; T.R.E. 403.

### XVI.

■ The next issue we must resolve is whether the evidence was sufficient to support the aggravating circumstance that the offense "was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." [3] This aggravating circumstance was found by the jury to apply in the murders of all three victims. At sentencing, Dr. Harlan testified regarding the manner in which each of the victims had died. Judy Smith was paralyzed and without feeling from the neck down and would have died between two and six minutes after the infliction of the fatal wound to her neck. She would have been conscious during the early portion of that time but unable to move. She may have been able to hear from between

---

3. The Defendant was sentenced under the capital sentencing statute as it stood prior to the 1989 Criminal Code Revision. *Compare* T.C.A. § 39–2–203(i)(5) (1982), cited above and § 39–13–

204(i)(5) (1991), which reads: "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

two and four minutes after being shot and thus could have heard the sounds of her children being murdered. Dr. Harlan's testimony at the guilt phase indicated that Judy's neck had been slashed and her stab and puncture wounds were inflicted after her death. Chad would have lived seven to eight minutes after receiving his fatal wounds and perhaps as many as 15 minutes after the gunshot wound to his chest. The wound to the chest was first and would have caused severe pain. Dr. Harlan also noted that Chad had received his multiple stab wounds prior to death. Jason had lived the longest, up to fifteen minutes, and had died slowly from stab wounds to the liver and left lower abdomen. Dr. Harlan said that the latter wound had been inflicted while Jason was already lying on the ground. For most of the time it took him to die, he would have been conscious and in extreme pain, fully aware of his condition as he cradled his small bowel in his arms as it protruded from his abdomen.

In *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985), this Court defined torture as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. The willful infliction of such severe pain necessarily involves depravity, which may also be shown by acts occurring shortly after the victim's death. The defendant's actions in this case meet the definition of this aggravating offense as set forth in *Williams* and applied in previous cases. *See, e.g., State v. Harris*, 839 S.W.2d 54 (Tenn. 1992); *State v. Black*, 815 S.W.2d 166 (Tenn. 1991); *State v. Payne*, 791 S.W.2d 10 (Tenn. 1990); *State v. Miller*, 771 S.W.2d 401 (Tenn. 1989); *State v. Johnson*, 743 S.W.2d 154 (Tenn.1987); *State v. Teague*, 645 S.W.2d 392 (Tenn.1983). The multiplicity of the wounds, the infliction of gratuitous violence on the victims and their needless mutilation supports application of this circumstance. *See State v. Melson*, 638 S.W.2d 342, 367 (Tenn. 1982), *State v. Dicks*, 615 S.W.2d 126, 131–132 (Tenn.1981); *cf. Proffitt v. Florida*, 428 U.S. 242, 255, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976).

■ Defendant also says that a finding of this aggravating circumstance is inherently inconsistent with the jury's verdicts that the murders were committed "with a cool purpose" as required for first-degree premeditated murder. Nothing in the definitions of torture or depravity under circumstance (i)(5) conflicts with this element of first-degree murder. The Defendant also raises the point made in Chief Justice Reid's dissent in *State v. Black*, 815 S.W.2d 166, 197 (Tenn. 1991), that, because the jury found that the Defendant killed Chad and Jason Burnett to avoid or prevent his arrest or prosecution, T.C.A. § 39–2–203(i)(6) (1982), their murders do not demonstrate Defendant's depravity of mind because they were killed for a purpose. The majority in *Black, id.* at 182, did not adopt this interpretation of the aggravating circumstances.

### XVII.

■ The next issue we must address is whether the death penalty may be imposed in this case upon a finding of the aggravating circumstance that the murders of Chad and Jason Burnett were committed to avoid, interfere with or prevent the lawful arrest or prosecution of the Defendant. T.C.A. § 39–2–203(i)(6) (1982) [now § 39–13–204(i)(6) (1991)]. The Defendant argues that this aggravating circumstance can only apply to this case if the State proves that Judy Smith was killed first. Such a chronology is not necessarily a prerequisite to finding this aggravating circumstance, *cf. State v. McCormick*, 778 S.W.2d 48, 53 (Tenn.1989) (circumstance not limited to first-hand witness of crime). For purposes of applying this circumstance, it is sufficient that the proof supports a finding that at least one motive for killing the boys was the threat they posed of the Defendant's apprehension regardless of the time of their mother's death. *See State v. Black*, 815 S.W.2d at 182. Jason's futile 911 phone call is evidence of his attempt to report the crime and secure the Defendant's capture by law enforcement officers. The record supports a finding that Defendant was aware of the efforts to contact police and that a motive for the boys' murders was to avoid or prevent Defendant's lawful arrest. *Compare State v. Branam*, 855 S.W.2d 563, 570 (Tenn.1993) (evidence insufficient to support this aggravating circumstance).

■ Defendant next argues that prevention of arrest and prosecution must be the "dominant motive" for the murders. This Court rejected a similar argument in *State v. Carter*, 714 S.W.2d 241, 250 (Tenn.1986) (avoidance of arrest need not be sole motive for murder). *See State v. Evans*, 838 S.W.2d 185 (Tenn.1992) (Evans committed the murder both while engaged in the robbery and in an effort to avoid arrest. Both motives are present and neither one is "dominant.") The Defendant relies upon a line of cases from Florida requiring that, before Florida's similar aggravating circumstance may be used to aggravate a murder, proof of the requisite intent must be very strong where the victim is not a law enforcement officer. *See, e.g., Garron v. State*, 528 So.2d 353 (Fla.1988); *Perry v. State*, 522 So.2d 817, 820 (Fla.1988); *White v. State*, 403 So.2d 331, 338 (Fla.1981); *Riley v. State*, 366 So.2d 19, 22 (Fla.1978). The Florida Supreme Court has applied this aggravating circumstance very strictly. Had our Legislature wished to require that there be only *one* motive or a "dominant motive" for an aggravating circumstance to be employed, it would have included such a requirement in the statute.

Finally, the Defendant submits that the finding of the "heinous, atrocious or cruel" aggravator precludes a finding of the circumstance in subsection (i)(6). There is no merit to this issue under *State v. Black, supra.*

### XVIII.

■ The Defendant next questions whether the death penalty may be imposed in this case under the aggravating circumstance that the murders of Jason and Chad Burnett were committed while the Defendant was engaged in committing the murder of Judy Smith. T.C.A. § 39–2–203(i)(7) (1982) [now § 39–13–204(i)(7) (1991)]. The Defendant avers that the jury's failure to return a verdict of guilty on the felony murder charges relating to the boys' deaths precludes, and is inconsistent with, a finding of this aggravating circumstance. First, the jury was instructed that they could not return a verdict of guilty as to each victim on both premeditated and felony murder but must limit their verdict of guilty to only one of the counts. Thus, under the court's instructions, a finding of guilty on the charges of premeditated murder does not preclude, and is not inconsistent with, the jury's finding of aggravating circumstance (i)(7) in the murders of Chad and Jason Burnett. This Court has also previously held that acquittal under a felony murder charge does not preclude a finding of this aggravating circumstance. *See State v. Wright*, 756 S.W.2d 669, 675–676 (Tenn.1988).

■ The Defendant also insists that evidence that the Defendant offered $20,000 to have all three victims killed is inconsistent with the application of the "felony murder" statutory aggravating circumstance. There was sufficient proof that Chad and Jason were killed in the perpetration of Judy Smith's murder to submit this aggravating circumstance to the jury. While there is a danger if this circumstance is too broadly applied in multiple murders that any murder after the first could arguably be enhanced by this aggravator, in the present case the proof supports a finding of circumstance (i)(7). *See, e.g., State v. Black*, 815 S.W.2d 166 (Tenn.1991).

### XIX.

The Defendant next asks whether the "mass murder" aggravating circumstance in T.C.A. § 39–2–203(i)(12) (1982) [now § 39–13–204(i)(12) (1991)] is applicable in this case. The statute reads as follows:

> The defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan.

The jury found the existence of the "mass murder" statutory aggravating circumstance as to all three victims. We held this aggravating circumstance applicable to a similar set of facts in *State v. Black*, 815 S.W.2d 166, 183–184 (Tenn.1991), where a majority of this Court held:

> The term "mass murderer" as used in the statute can apply to multiple murders committed close in time or multiple murders committed singly over a longer period of time, not to exceed four years. We are of

the opinion that the statute encompasses a situation where a defendant is simultaneously tried, as in the present case, for a series of separate but related homicides committed as part of a common scheme or plan.

815 S.W.2d at 184. *See also State v. Van Tran,* 864 S.W.2d 465, 478 (Tenn.1993).

■ The Defendant relies on Chief Justice Reid's dissent in that case and argues that the murders must have been committed over an *extended* period of time before this circumstance can apply. A majority of this Court, however, found that the "mass murder" aggravating circumstance was appropriate for a series of separate but related homicides committed as part of a common scheme or plan, as in this case.

### XX.

■ The Defendant's final issue deals with the constitutionality of Tennessee's death penalty statute. The Defendant contends that Tennessee's statutory scheme for capital sentencing violates his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8, 9, 16 and 19 of the Tennessee Constitution. The Defendant says that the aggravating circumstances in the statute do not genuinely narrow the class of persons eligible for the death penalty and argues that the use of the circumstance of felony murder to aggravate a felony murder fails to narrow the class. This may be true in the case of felony murder, *see State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), but the aggravating circumstances have performed their constitutional function in this case, where the Defendant was convicted of premeditated murder. *See State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989). Defendant says the statute unconstitutionally mandates a sentence of death. This argument was rejected in *State v. Smith,* 857 S.W.2d 1, 21–22 (Tenn.1993); and *State v. Black,* 815 S.W.2d at 185 (and cases cited therein). The Defendant states that the absence of a requirement that the jury specify the mitigating factors it found prevents effective appellate review and overemphasizes the importance of the aggravating circumstances, which are required to be listed. There is no merit to this issue under *State v. Melson,* 638 S.W.2d 342, 368 (Tenn.1982). In his last two attacks on the statute, Defendant contends that death per se and execution by electrocution are cruel and unusual punishment. These arguments were recently rejected by a majority of this Court in *State v. Black,* 815 S.W.2d at 179, 187–191.

### *CONCLUSION*

We find no error in the guilt phase or sentencing phase of this case. In accordance with the mandate of T.C.A. § 39–13–206(c)(1)(D) [formerly T.C.A. § 39–2–205(c)(4) ], we find: that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's findings of the statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found.

■ Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See State v. Black,* 815 S.W.2d 166 (Tenn.1991); *State v. Payne,* 791 S.W.2d 10 (Tenn.1990); and *State v. Johnson,* 743 S.W.2d 154 (Tenn.1987). We have studied, compared and analyzed cases, and conducted a meaningful proportionality review as outlined in *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn.1988). As stated in *State v. Harris,* 839 S.W.2d 54, 77 (Tenn.1992), "no two cases are alike, and no two defendants are alike." A comparative review helps us make the determination of whether the penalty imposed in this case is or is not disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. *See Lockett v. Ohio,* 438 U.S. 586, 602–605, 98 S.Ct. 2954, 2963–2965, 57 L.Ed.2d 973 (1978).

The Defendant's clearly identifiable bloody palm print was found on the sheet next to Judy Smith's body and the 911 tape established the Defendant's presence at the scene at the time the murders were being commit-

ted. Clearly, the Defendant's bringing three weapons, including an awl, is evidence that he not only planned the murders ahead of time, but planned the torture as well. The murders of the three victims, as described earlier in this opinion, involved the intentional, senseless, brutal, gruesome and violent killing of three helpless people, which clearly warrants the imposition of the death penalty. We find that the sentence of death in the case of Judy Smith was not imposed in an arbitrary fashion, that the evidence supports the jury's findings of two statutory aggravating circumstances. We further find that the sentence of death in the cases of Chad and Jason Burnett was not imposed in an arbitrary fashion, that the evidence supports the jury's findings of four statutory aggravating circumstances, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found.

The sentence of death will be carried out as provided by law on the 23rd day of February, 1994, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN and ANDERSON, JJ., concur.

REID, C.J., and DAUGHTREY, J., file separate concurring opinions.

REID, Chief Justice, concurring.

I concur in affirming the defendant's conviction of the premeditated first degree murder of Jason Burnett, and the sentence of death upon that conviction. I agree with Justice Daughtrey's observation that discussion of the sentences of death imposed for the murders of Judy Smith and Chad Burnett would serve no useful purpose, whether in concurrence or dissent.

Except as noted below, this case presents the same issues regarding the imposition of the sentence of death as were present in *State v. Howell,* 868 S.W.2d 238 (Tenn.1993), and my concurrence with the decision affirming the sentence in this case is based on the reasons set forth in my concurring opinion in *Howell.* There is no basis in this record on which this Court can make the determina-

tions necessary to hold that the statute authorizing the imposition of the sentence of death does not reflect contemporary standards of decency in Tennessee. *Id.* at 265–66. Furthermore, the trial of this case was essentially free of error, according to procedures permitted by prior decisions of this Court. The record could well serve as a text for the trial of a capital case. Any deficiencies, none of which require reversal of the conviction or sentence, have been invited by this Court's failure to adopt procedures that would compel compliance with constitutional standards in every case in which the sentence of death is affirmed.

In this case, the defendant asserts that the evidence does not support aggravating circumstance T.C.A. § 39–2–203(i)(5), "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," and that the facts necessary to support aggravating circumstance (i)(5) are inconsistent with a finding of premeditated murder or a finding that the murder was committed to avoid arrest.

In *State v. Black,* 815 S.W.2d 166 (Tenn. 1991), in dissent, I agreed with the defendant's contention that the instruction with regard to depravity of mind was unconstitutionally vague and inconsistent with a finding that the killing was committed to prevent lawful arrest. In that case, there was no evidence of torture. Each of the victims had been shot in the head and obviously had died immediately. The prosecution contended that the facts showed depravity of mind. *Id.* at 181. In the case before the Court, the wounds inflicted upon Jason Burnett support the finding of torture, about which there is no uncertainty. Also, torture, as distinguished from depravity of mind, is not inconsistent with the deliberation present in premeditated murder or the decision to kill for the purpose of avoiding arrest, the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(6).

In *State v. Black,* in dissent, I further stated that, in my view, the killing of three members of a family at the same time and place is not "mass murder" within the meaning of the statute, T.C.A. § 39–2–203(i)(12). 815 S.W.2d at 197. As pointed out by Justice

Fones, dissenting in *State v. Bobo,* 727 S.W.2d 945, 957 (Tenn.1987):

> [A]s rewritten by this Court, the mass murder aggravating circumstance is completely redundant because every murder conviction that could be proven would fully support aggravating circumstance number two and in some instances would fully support the death penalty under aggravating circumstance number seven. The result is that the Court strains legislative intent to the breaking point, rewrites a statute to conform to its view of legislative intent, but nothing of substance that was not already included in the aggravating circumstances theretofore enacted, has been added. I would declare the mass murder aggravating circumstance unconstitutional, period.

However, any evidence admitted in support of "mass murder" was otherwise admissible. Consequently, there was no inadmissible evidence that could have affected the jury's decision. For the reasons more fully discussed in *State v. Howell,* 868 S.W.2d at 267, charging mass murder as an aggravating circumstance was harmless error beyond a reasonable doubt.

In *Black,* it was my view that the Court could not reasonably conclude that the valid aggravating circumstances outweighed the mitigating circumstances, but I have reached the opposite conclusion in this case. The reasoning in *Black* was as follows:

> Once the remaining aggravating circumstances are distilled to their factual essence, it is evident that the defendant was found eligible for the death penalty because the victim was a child, T.C.A. § 39–2–203(i)(1); because the defendant had been involved in an earlier altercation with Angela Clay's husband, T.C.A. § 39–2–203(i)(2); and because he killed Lakeisha Clay in connection with the murder of her mother, T.C.A. § 39–2–203(i)(6) and (7). Qualitatively, except for the age of the victim, every aggravating circumstance properly found in this case arose from the defendant's emotional involvement with Angela Clay. On the other hand, in mitigation, the defendant presented testimony that before his involvement with Angela Clay, he had been a responsible and non-

violent person, that he was a model prisoner, that he suffered from psychological problems, and that his violent behavior was focused on the Clay family.

> As this Court stated in *Delk v. State,* 590 S.W.2d 435, 442 (Tenn.1979), "the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required" to support the results reached by the jury. In this case the margin is slim. I would not find as a matter of law that the jury's consideration of these invalid aggravating circumstances was harmless error.

815 S.W.2d at 198. In *Black,* the defendant killed his "girlfriend" and her two small children because she was becoming reconciled with her estranged husband. The record in *Black* showed the murder to have been the result of a sudden outburst of deadly violence caused by irrational and uncontrolled jealousy.

The circumstances of the present case are substantially different, even though the victims in both cases were a mother and her two children. The acts of the defendant in the case before the Court, were, in contrast, cold and deliberate. The defendant had planned over a long period of time to kill his ex-wife and her two children. He had purchased insurance on the lives of the victims on three occasions shortly before he killed them. He made three separate solicitations to have his wife or his wife and the stepsons killed, including an offer of $20,000, and an offer whereby he would kill the other person's wife. The defendant made many threats to kill his wife and her children, some to the wife directly and some to other persons. He planned his work schedule so that he could claim that he was out of the state on the night the murders were committed.

Based on these significantly different factual situations, it is my view that a court could not find that beyond a reasonable doubt the aggravating circumstances in *Black* outweighed the mitigating circumstances, but could find that beyond a reasonable doubt the aggravating circumstances outweigh the mitigating circumstances in the case before the Court.

The deficiencies of the Court's comparative proportionality review were noted again in *State v. Howell*, 868 S.W.2d at 271–72. Nevertheless, as in *Howell*, the record shows that the defendant in this case is among those most deserving of the ultimate sanction. The Court's failure in this case to perform any meaningful comparative review does not require that the sentence be reversed.

DAUGHTREY, Justice, concurring.

I concur fully in the decision to affirm the defendant's conviction on three counts of first-degree, premeditated murder. The guilt-innocence phase of the trial was meticulously handled by the trial judge, and although no trial is perfect, the mistakes made in this one were apparently trivial and without discernible affect on the jury's verdict.

The sentencing phase of the trial was also carefully conducted, and, given the senseless nature and the horrifying circumstances of the murders committed in this case, it is not surprising that a "death-qualified" jury would vote to impose the ultimate penalty against Oscar Franklin Smith on all three counts. As to one of the victims, Jason Burnett, who was deliberately eviscerated by his step-father and left to die an unnecessarily painful and terrifying death, there can be little doubt that capital punishment is both proportional to the offense and supported by sufficient aggravating circumstances, as set out in Tennessee's first-degree murder statute. Because the two additional death penalties are obviously redundant, and because the strength of the evidence with regard to those two sentences is less clear than it is with regard to the murder of Jason, I conclude that it is unnecessary to subject them to further examination.

In the absence of trial error, the only other impediment to imposition of the death penalty for the murder of Jason Burnett would be a finding that the procedure set out in Tennessee's capital punishment statute was unconstitutional in some respect (including the manner of execution). However, as the author of the lead opinion in this case points out, all the constitutional questions raised by this defendant have been previously decided against his insistence, although sometimes by a divided court.

For the reasons set out in this separate opinion, I concur in the judgment of the trial court finding the defendant guilty of murder in counts one, two, and four of the indictment and in the sentence imposed with regard to count four.