
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 11, 2022 Session

## OSCAR SMITH V. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 89-F-1773       Angelita Blackshear Dalton, Judge**

_____

### No. M2021-01339-CCA-R3-PD

_____

Petitioner, Oscar Smith, a death row inmate, appeals from the Davidson County Criminal Court's summary dismissal of his petition requesting analysis of evidence pursuant to the Post-Conviction Fingerprint Analysis Act of 2021. Based upon our review of the record, oral arguments, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Amy D. Harwell, Assistant Chief, Capital Habeas Unit and Katherine M. Dix, Assistant Federal Public Defender (on appeal), Nashville, Tennessee, for the appellant, Oscar Franklin Smith.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Samantha Simpson, Assistant Attorney General; Glenn R. Funk, District Attorney General, for the appellee, State of Tennessee.

### OPINION

Over 32 years ago, Petitioner murdered his estranged wife, Judith (Judy) Lynn Smith, and her two minor children, Chad and Jason Burnett, at their home in Nashville. *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993). He received death sentences for each of the three murders. *Id.* As to the murder of Ms. Smith, the jury found the murder was especially heinous, atrocious, or cruel and that Petitioner committed mass murder. T.C.A. §§ 39-2-203(i)(5) and (12) (1982). In addition to these two aggravating circumstances, the jury also found two more aggravators for the murders of the two children: the murder was

committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution and the murder was committed during the perpetration of the murder of Ms. Smith. T.C.A. §§ 39-2-203(6) and (7) (1982). Petitioner's convictions and sentences were upheld on direct appeal. *Smith*, 868 S.W.2d at 582. He was unsuccessful in his subsequent pursuit of state post-conviction and federal habeas corpus relief. *Oscar Franklin Smith v. State*, No. 01C01-9702-CR-00048, 1998 WL 345353 (Tenn. Crim. App. June 30, 1998), *perm. app. denied* (Tenn. Jan. 25, 1999); *Oscar Smith v. Ricky Bell, Warden*, No. 3:99-0731, 2005 WL 2416504 (M.D. Tenn. Sep. 30, 2005), *vacated sub nom. Smith v. Colson*, 566 U.S. 901 (2012) (Order); *Oscar Smith v. Tony May, Warden*, No. 18-5133, 2018 WL 7247244 (6th Cir. Aug. 22, 2018).

On July 1, 2021, the Post-Conviction Fingerprint Analysis Act of 2021 (hereinafter "Fingerprint Act" or "Act") was enacted into law. T.C.A. §§ 40-30-401 to -413 (Supp. 2021). The Act provides that, upon the return of unfavorable results, the court shall dismiss the petition. T.C.A. § 40-30-412. However, if the results are favorable, the court shall order a hearing. *Id*. Petitioner filed a petition pursuant to the Act on that very date. Having already secured what he deems to be favorable testing results challenging the trial testimony of Sgt. Johnny Hunter, a certified latent print examiner, that a bloody palm print found at the crime scene was a match for Petitioner, Petitioner requested a hearing pursuant to Section 412 of the Act. In the alternative, Petitioner asserted he has satisfied the requirements of Section 405 and thus requested the trial court to order further testing of the palm print evidence pursuant to Section 410. Without conducting a hearing, the trial court issued a written order denying the petition. Petitioner now appeals.

**Facts**

As will be discussed below, "'the opinions of [the appellate courts] on either the direct appeal of the conviction or the appeals in any previous post-conviction or habeas corpus actions may provide some assistance. These sources provide the essential facts of the crime at issue and may be helpful to trial courts in their assessment of the merits of any claim [asserted under the Fingerprint Act].'" *Powers v. State*, 343 S.W.3d 36, 56 (Tenn. 2011). Thus, as the trial court did, we have chosen to quote the federal district court's summary of the trial evidence for perspective as relative to resolution of the issues raised in the instant appeal:

> 1) Oscar Frank Smith ("Petitioner") and Judith married in 1985. It was Judith's third marriage and Petitioner's second. Judith had two sons - Chad and Jason - by a previous marriage who, at the time of the murders, were 16 and 13 respectively. Petitioner also had two children by a previous marriage, who basically had been raised by Petitioner's mother and, at the time of the murders, were 14 and 17. In the second year of her marriage to Petitioner, Judith gave birth to twin boys.

2

2) On June 17, 1989, Petitioner and Judith separated, after an apparently violent confrontation between Petitioner and Judith's thirteen-year-old son, Jason.

3) Judith's sister, Theresa Zastrow ("Zastrow"), testified that Judith told her Petitioner and Jason had gotten into a fight at Petitioner's trailer, that Petitioner had put a gun to Jason's head, and that Petitioner had fired a shot into the air as Judith and Jason were leaving. According to Zastrow, Judith told her that Petitioner warned her not to try to take the car or the twins, and that he would kill her if she called the police.

4) Judith swore out a warrant against Petitioner for aggravated assault in connection with this incident. On August 1, 1989, Judith swore out a second warrant for aggravated assault, alleging that Petitioner had assaulted her.

5) Sally Goodman ("Goodman") - an administrator with the General Session[s] and Domestic Relations Courts in Robertson County - testified that there were two warrants pending against Petitioner at the time of the murders. The first warrant, dated June 17, 1989, was for the aggravated assault against Jason, with respect to which Goodman testified that she had seen a swollen bite mark on Jason's back. The second warrant, dated August 1, 1989, was for the aggravated assault against Judith.

6) A contentious issue in the ensuing divorce proceedings was custody of the three-year-old twins. Judith had been given temporary custody; Petitioner had visitation rights every other weekend and had been ordered to pay support.

7) On Sunday, October 1, Petitioner, who had visitation with his twins that weekend, took them to Judith's home at 324 Lutie Street. Despite their marital problems, Petitioner and Judith left the twins with Chad and Jason for the entire day, while they spent hours drinking coffee in two different Waffle House restaurants, looked for a replacement used car for Judith, bought flowers at a florist, and had dinner at the Gold Rush restaurant on Elliston Place. Numerous witnesses testified to these events, and the testimony included the fact that the couple talked quietly and did not appear to be arguing.

8) Petitioner drove Judith back to 324 Lutie Street between 9:30 and 10:00 p.m. that evening, then took the twins back home with him and left them with his mother.

3

9) Judith's sister, T[h]eresa Zastrow ("Zastrow"), testified that she called Judith at 10:30 p.m. on the night of the murders and that they had talked for approximately fifteen minutes.

10) Cheryl Dalton ("Dalton") - employed by the Metro-Nashville Police Department Communications Division at the time of the murders - testified that she received a 911 "panic call" from 324 Lutie Street at 11:20 p.m. that night. Dalton identified the tape introduced at trial as a copy of the tape of that call. Dalton testified further that a transcript of the call introduced as State's Exhibit 18 at trial was an accurate representation of what she heard on the enhanced version of the tape.

11) Police were dispatched to the scene and arrived shortly after the call. After knocking on the front door, receiving no answer, hearing no noise, and looking around the side of the house, the officers departed, concluding that the call was a "false call."

12) The next day, Monday, at approximately 3:00 p.m., the bodies of Judith, Chad, and Jason were found murdered at 324 Lutie Street. There were no signs of forced entry.

13) Judith was found lying on the bed in her bedroom with gunshot wounds in her neck and arm, ice pick-like puncture wounds to her chest, and her neck slit. Jason was found on the floor at the foot of that bed, with numerous knife wounds to his neck, abdomen and chest, and defensive wounds on his hands. He was lying on his left side with his intestines protruding from his abdominal wounds. Found under him, never explained, was a hair dryer that was running. Chad was found in the kitchen, where a violent struggle had taken place and where the 911 call, in all likelihood, originated. He had gunshot wounds to his head, chest and shoulder, knife wounds to his chest, back, abdomen and neck, ice pick-like puncture wounds to his chest, and defensive wounds on his hands.

14) Sergeant Johnny Hunter ("Sgt. Hunter") - officer in charge of the Metro Latent Fingerprint Section at the time of the murders - testified as to physical evidence recovered at the crime scene. A leather tooling instrument called an awl, which looks much like an ice pick, was found with blood on it in the kitchen. A left-hand cotton work glove was found in the bedroom where Judith's and Jason's bodies were. A live .22 caliber cartridge was found in the bedroom across the hall from where Judith's and Jason's bodies were found. A partially-eaten pizza and a bologna sandwich with one bite out of it were found on the kitchen counter. A palm print made in blood was found on the sheet near Judith's body on the bed. Jason's fingerprints were found

4

on a kitchen table leg that had been broken off from the table and on the telephone receiver and telephone base in the kitchen. Other latent prints were recovered from the scene and examined, one of which did not match Petitioner's. A bloody footprint in the kitchen likewise was never connected to Petitioner. Sergeant Hunter testified that Jason had some strands of hair in his hand, which Special Agent Chester Blythe (Agent Blythe) of the FBI testified turned out to be Judith's and Jason's. A partially-written letter that Judith had been writing to Billy Fields, the man she was seeing at the time of the murders, and a partially-written letter that Chad had been writing to his girlfriend were recovered from the scene as well.

15) The .22 caliber weapon that was used to shoot the victims was never recovered from the crime scene or elsewhere. The knife used to stab all three of the victims was never recovered. The awl, which probably made the puncture wounds, contained no identifiable fingerprints.

16) Detective Don Bennett ("Detective Bennett") of the Robertson County Sheriff's Office testified that he drove to Petitioner's home on the day that the bodies were discovered and told Petitioner that officers of the Metropolitan-Nashville Police Department ("Metro") wanted to speak with him. Detective Bennett testified that Petitioner accompanied him without ever asking why the Metro officers wanted to talk with him.

17) Metro Detectives E.J. Bernard ("Detective Bernard") and Mike Smith ("Detective Smith") testified that they interviewed Petitioner at the Robertson County Sheriff's Office. Both detectives testified that Petitioner never asked them why he was being questioned. Detective Bernard testified that Petitioner had told them he had spent much of Sunday helping Judith look for a car and that he had left her house that evening at between 9:00 and 9:30 p.m. Detectives Bernard and Smith testified that Petitioner had told them that he had dropped the twins off at his mother's house, packed and left for Kentucky between 10:00 and 10:30 p.m., where he was to perform some work for his employer. According to Detective Bernard, Petitioner told him that the drive had taken longer than it should have because of fog. Detectives Bernard and Smith testified further that, when referring to Judith, Petitioner spoke of her in the past tense repeatedly, even before he had been told of the murders. Moreover, when he was told of the murders well into the interview, Petitioner did not ask the officers the logical questions of where, when, how and by whom.

18) Detective Bernard testified that Petitioner had abrasions on his right hand, right elbow, left back and shoulder blade, which Sgt. Hunter testified were photographed.

5

19) When interviewed later that evening, Petitioner's mother told three different officers - Detective Bernard, Metro Detective Grady Eleam ("Detective Eleam"), and Sgt. Hunter - that Petitioner had arrived home at approximately 10:15 p.m. on the night of the murders, dropped off the twins, went to his trailer and then left for Kentucky. Detective Bernard testified further that, when he asked her what time Petitioner had left for Kentucky, she told him that she did not know.

20) Detective Larry Flair ("Detective Flair") collected an empty leather holster, two belts with the name "Frank" on them, a .22 caliber cartridge, and leather-working tools from Petitioner's trailer during a search on October 13, 1989.

21) Tommy Heflin (Heflin) - a Tennessee Bureau of Investigation (TBI) firearms examiner - testified that, although the bullets recovered from the victims' bodies were different from the cartridge recovered from Petitioner's trailer, the firearm used in committing the murders could have fired both types of ammunition.

22) Don Robirds ("Robirds") - Judith's father, and Chad's and Jason's grandfather - testified that he heard Petitioner threaten to kill his daughter in the Spring, before they separated, and again a couple of weeks prior to the murders. Robirds also testified that, two to three weeks before the murders, Petitioner told him to tell Judith that "the gloves are coming off."

23) Judith's sister, Zastrow, testified that she saw rope burns on Judith's wrists and throat from the attack that led to Judith's swearing out the second warrant and that Judith stayed for a time in a shelter before going back to her house at 324 Lutie Street in Nashville, where she had lived with Chad, Jason, and the twins after the separation.

24) Sheila Gunther ("Gunther") - one of Judith's co-workers at the Waffle House in Nashville - testified that, at Judith's request, she listened in on telephone calls that Petitioner made to Judith at work over a period of four to six weeks in the summer of 1989, in which Gunther overheard Petitioner threaten to kill Judith on at least a dozen occasions. Gunther testified that Petitioner usually threatened to shoot Judith, but that once he threatened to stab her. Gunther further testified that she heard Petitioner threaten to kill Chad and Jason, because he felt that Judith was better to them than she was to the twins. In August, Petitioner, who apparently knew that Gunther was listening in on his conversations with Judith, threatened to kill [Gunther] and her children during one of the calls.

6

25) Jerry Williams ("Williams") - one of Petitioner's co-workers at the Maintenance Service Corporation - testified that, while driving around together in 1988, Petitioner offered to kill Williams's wife if Williams would kill Judith. Williams also testified that Petitioner came to his house two weeks later, repeated his offer, and said that he would pay Williams to kill Judith.

26) Raymond Merritt ("Raymond Merritt") - another of Petitioner's co-workers at the Maintenance Service Corporation - testified that Petitioner asked him twice if he knew anyone who would kill his family, specifying that the twins were not to be harmed. The second time Petitioner offered to pay $20,000 if Merritt could find someone who would kill Judith and her teenage sons.

27) Petitioner was the beneficiary on one or more life insurance policies insuring the lives of Judith, Chad and Jason. In February of 1989, Petitioner and Judith took out a family life insurance policy with Liberty National Insurance on the lives of Petitioner, Judith, Chad and Jason, the twins, and Petitioner's two children by his previous marriage. The insurance on Judith's life was $20,000, and Chad and Jason's lives were insured for $5,000 each. Petitioner was the beneficiary on the insurance covering the lives of Judith, Chad and Jason. The beneficiary on the life insurance for Petitioner was Petitioner's mother. This policy lapsed in July of 1989, during the separation, but was renewed by reinstatement when Petitioner and his father paid the premium on August 15, which was two weeks after the aggravated assault warrant was taken out for the assault against Judith and two months after the earlier warrant for aggravated assault on Jason. On March 6, 1989, another policy insuring Petitioner, Judith, and their six children was taken out with American General Life Insurance Company, insuring Petitioner and Judith for $20,000 each, and each of the children for $10,000. Each of the policies taken out in 1989 was with a different company and not with United Insurance Company of America, where Petitioner and Judith had had life insurance in effect since August of 1985. That policy would pay Petitioner $4,000 upon the death of Chad or Jason, and $10,000 upon the death of Judith, unless her death was accidental, in which case the policy paid $20,000.

28) Ron Merritt ("Ron Merritt") - the Maintenance Service Corporation plant manager - testified that Petitioner had been assigned the Friday prior to the murders, i.e., September 29, 1989, to go to Seal Master Corporation ("Seal Master") the following Monday. Merritt testified to several unusual aspects of that assignment. First, Petitioner came to him and asked if he could drive

7

to Morehead, Kentucky Sunday night, instead of Monday morning, a request that Merritt considered unusual because the customer was not expecting a service representative until mid-day because of the drive. Merritt testified that Petitioner telephoned Maintenance Service Corporation at 7:19 a.m. on Monday morning to let them know that he was at the customer's plant, which was not the customary practice. Merritt also testified that he found a 12-foot wide roll of plastic, normally kept at the loading dock, opposite Petitioner's work station when he closed the plant that Friday afternoon.

29) Zastrow testified that, during their telephone conversation shortly before the murders, Judith told her Petitioner had taken the twins with him because he had told her he was off work the following day.

30) Barbara Kohus - a signal process analyst with the FBI - introduced the enhanced version of the 911 tape into evidence. On the tape, a voice identified as Jason's yells, "Help me!" as a second voice, identified as Chad's, screams in the background, "Frank, no, God, help me!" The tape concludes abruptly with Jason saying "324 Lutie Street."

31) Robards [sic] and Zastrow testified that Petitioner always went by the name "Frank," and not Oscar. Raymond Merritt testified that Petitioner wore a belt with the name "Frank" on it, and, when he asked Petitioner why, Petitioner told him that his "real name was Frank." As previously noted . . . Detective Flair recovered two leather belts from Petitioner's trailer, both with the name "Frank" on them.

32) Petitioner testified that he went by both "Frank," his middle name, and "Oscar," his first name.

33) Danny Abston (Abston) - who was visiting his father-in-law at 318 Lutie Street the night of the murders - testified that he observed a white LTD that looked like "an old police car" in the driveway of the victims' house between 11:00 and 11:15 p.m.

34) Raymond Merritt testified that Petitioner drove "a white Ford, an old squad car." Detective Smith testified that Petitioner's car was "a four door white Ford, Crown Victoria . . . an old police car."

35) Petitioner testified that he owned a 1987 Ford LTD, "an ex-police patrol car . . ."

36) Dr. Mona Gretel Harlan (Dr. Gretel Harlan) - the Assistant Davidson County Medical Examiner - testified that Judith's and Chad's bodies

exhibited wounds made by three different weapons: gunshot wounds from .22 caliber bullets, multiple stab and slashing wounds made by a knife, and wounds made by an object like an ice pick or an awl. Jason's wounds were inflicted by a knife only. Dr. Gretel Harlan fixed the time of death at between 11:20 and 11:30 p.m. on October 1.

37) Jerry Watts ("Watts") - one of Petitioner's co-workers at Maintenance Service Corporation - testified that Petitioner owned a .22 caliber pistol and that Petitioner was thinking about selling it. Watts testified that Petitioner's .22 caliber pistol, to which Petitioner referred as his "baby," was in a hand-tooled leather holster that Petitioner told Watts he had made himself. Watts further testified that, on July 3, 1989, he met Petitioner at a local shooting range, where they fired Petitioner's firearms, including the .22 caliber pistol. Watts identified an empty holster introduced into evidence as the one that the .22 caliber revolver had been in, the holster that Petitioner claimed to have made.

38) Watts' testimony about shooting on a range with Petitioner was corroborated by Larry Hickerson ("Hickerson") - vice-president and general manager of Gun City U.S.A. - whose records showed that both Petitioner and Watts fired at the range on July 3, 1989.

39) Petitioner denied owning a .22 caliber pistol at the time in question and claimed that he had not owned one since the late 1960s or early 1970s. Petitioner also denied having told Watts that he had made the leather holster, which was recovered empty from Petitioner's trailer.

40) Robards, [sic] Zastrow, Watts, and witness for the defense, William Sergeant ("Sergeant"), whom Petitioner had known for thirteen years, all testified that Petitioner carried a buck or folding-type knife on his belt with a blade 3 to 4 inches in length. Sergeant also testified that Petitioner was ambidextrous.

41) Detective Bernard testified that, when he asked Petitioner if he ever carried a knife on his belt, Petitioner replied, "Never."

42) Petitioner testified at trial that he had not carried a knife on his belt since the early 1970s.

43) Petitioner, his mother, father, daughter, and Raymond Merritt all testified that Petitioner was a leather crafts enthusiast.

44) Linda Davis ("Davis") - manager of the Tandy Leather Company - testified that the awl found at the murder scene was a very basic leather-working tool used to punch holes and mark guidelines. An awl was not found among Petitioner's leather-working tools recovered from his trailer. When shown some of the leather items that Petitioner had made, Davis testified that an awl would have been required for the work and that none of the other tools recovered from Petitioner's trailer could have performed the same function.

45) Petitioner denied that the awl found at the murder scene was his and identified another tool among his tools that he claimed could have performed the same function as an awl.

46) Petitioner testified that he left his trailer for Kentucky at 11:30 p.m. and that, making two stops at convenience stores for gas, he arrived in Morehead, Kentucky a little after 7:00 a.m. the following morning, October 2.

47) Metro Detective Terry McElroy ("Detective McElroy") testified that he drove from Petitioner's trailer to the Kentucky job site, and from Judith's house to the Kentucky job site, and back, via two different routes. Detective McElroy testified that, under no circumstances, would the trip require much more than five hours.

48) As previously noted . . . Petitioner told Detective Bernard that he took so long to get to Kentucky because it was foggy. Petitioner also testified at trial that he had been delayed by fog. However, weather reports introduced by the prosecution, and by stipulation, did not substantiate Petitioner's claim that his trip was slowed by dense fog most of the way.

49) Petitioner produced five toll receipts for his trip on the Blue Ridge [P]arkway, all of which, except for one, were dated October 2, with no times noted. The receipt for the middle toll booth *en route* was dated October 1, which Petitioner claimed was simply a mistake by the toll booth.

50) Clinton Ray Curtis ("Curtis") - an employee at Seal Master - testified that Petitioner arrived on the job at approximately 8:00 a.m. on October 2. Curtis further testified that, in a conversation about a recent mass-murder at a McDonald's in California, Petitioner stated, "You never know when one of us could snap and do something like that."

51) Sergeant Hunter testified that he observed what appeared to be a bloody, left-hand palm print next to Judith on the sheet during his initial sweep of the crime scene. When reevaluating the evidence on January 30, 1990, Sgt. Hunter discovered that the bloody palm print on the sheet was missing two

fingers. Sergeant Hunter testified that he identified the bloody palm print in the lab using an Alternative Light Source (ALS) illumination technique, that the palm print had fifteen points of identification, whereas the FBI only required eight points of identification, and that there were no unexplainable dissimilarities. Sergeant Hunter introduced photographs at trial of Petitioner's left hand, which showed that Petitioner was missing the same two fingers as the bloody palm print on the sheet.

*Oscar Smith*, 2005 WL 2416504 at *1-9 (footnotes and internal citations to record omitted); s*ee also Smith*, 868 S.W.2d at 565-568 (supreme court's summary of evidence on direct appeal).

## Previous Litigation

On direct appeal, Petitioner unsuccessfully challenged the admission of the testimony of Sgt. Hunter regarding the "alternate light source technique" used to identify the bloody palm print found on the bed sheet next to Ms. Smith's body. *Smith*, 868 S.W.2d at 576. This is the palm print that is the subject of the instant Fingerprint Act appeal. Petitioner is missing two fingers on his left hand, and Sgt. Hunter testified the bloody latent palm print, which also happens to reveal two missing fingers, matched, without a doubt, Petitioner's hand. Our supreme court held that the trial court did not err in allowing Sgt. Hunter to testify as an expert based upon his use of the alternative light source technique. *Id.*

In affirming the denial of post-conviction relief, this Court made the following observations regarding Petitioner's attack on trial counsel's failure to challenge the State's analysis of the crime scene:

> Petitioner insisted before trial and throughout trial, and he insists even now, that he did not commit these murders and was not present at the scene. It seems unreasonable, despite what Petitioner implies, that he would have wanted counsel to risk any credibility in his alibi defense by contesting and arguing with the crime scene analysis. In fact, counsel decided this would not be wise. Given Petitioner's insistence and the circumstances of the case, we believe counsel made an informed and reasonable decision. Counsel stated that certain pieces of evidence, including the palm print, simply could not be contested. Accordingly, despite the alibi defense, it would not have been particularly helpful to Petitioner to contest some, but not all, of the crime scene evidence.

*Oscar Franklin Smith*, 1998 WL 345353 at *23. Petitioner did not specifically challenge trial counsel's representation regarding the bloody palm print evidence in post-

conviction. *Id.* at *24. To that end, trial counsel testified during the post-conviction evidentiary hearing as follows:

> [Attorney James Paul] Newman stated that the palm print was "absolutely devastating." Newman researched the alternate light source technique used to raise the palm print and asked Allen Barrett, a fingerprint expert for the F.B.I. and T.B.I., to review the fingerprint evidence in the presence of Petitioner. According to Newman, Petitioner was not contesting that the print was his; he was claiming that someone planted the print at the scene. Nonetheless, Barrett opined that the print was indeed Petitioner's. Newman testified, however, that Barrett informed him, because the print was in blood, as well as other factors, that it would have been improbable for someone to have planted it. Accordingly, they did not see the need to obtain other experts in this area. The defense figured that the only successful way to keep this piece of evidence out was to attack the technique used to confirm the print comparison. [Which, as noted above, proved to be unsuccessful.]

*Id.* at *15.

In his initial federal habeas corpus proceeding, Petitioner challenged trial counsel's investigation into the bloody palm print. The district court concluded Petitioner failed to demonstrate how he was prejudiced by counsel's presumed deficient decision not to investigate the bloody palm print. *Oscar Smith*, 2005 WL 2416504 at *87. In support of its conclusion in that respect, the court observed:

> the record also is devoid of any proof that establishes that the analysis of the bloody palm print is incorrect, or that the bloody palm print is not Petitioner's. Moreover, Petitioner made no effort to offer any proof at the habeas corpus evidentiary hearing that the bloody palm print is not Petitioner's, even though the lengthy examination of Sgt. Hunter offered ample opportunity to do so.

*Id.* at *70. Furthermore, as to Petitioner's challenge to trial counsel's decision not to secure expert services to assist with Sgt. Hunter's testimony regarding the alternate light source technique, the district court held:

> Although no proof was adduced at the habeas corpus evidentiary hearing regarding the trustworthiness and reliability of the ALS [alternate light source], the court concludes, just as the Tennessee Supreme Court did, that the ALS is merely a tool used to make fingerprints clearer for examination and comparison. In other words, the ALS does not perform the analysis or produce the results. Rather, it merely permits the user to see the

image more clearly. In that regard, using the ALS is no different than using a flashlight or a magnifying glass.

From the foregoing, and the record as a whole, the court concludes that Petitioner has not demonstrated that he was prejudiced by defense counsels' decision not to retain the services of a forensic criminologist to assist the defense with Sgt. Hunter's testimony pertaining to the ALS.

*Id.* at \*75. Petitioner also claimed the State withheld exculpatory evidence and knowingly presented false testimony at trial regarding the bed sheet containing the bloody palm print recovered at the crime scene. In denying relief on that claim, the district court ruled:

Sergeant Hunter testified at the evidentiary hearing that, although the ALS equipment was brought to the scene, he did not remember using it to examine anything. It can be used, he testified, to examine hair, fiber, tool marks and other pieces of evidence. Sergeant Hunter testified that he did examine the palm print on the sheet at the scene with a flashlight but did not see enough ridge detail for him to conclude that there would be any evidentiary value to the print on the sheet. He collected the sheet for use as fiber evidence. Importantly, Sgt. Hunter testified that he did not notice at the scene that it looked like the hand that made the palm print had two fingers missing; it simply did not occur to him. Also at the scene, he did not yet know that Petitioner had two fingers missing on his left hand. He did discover that the next day, but he never went back to look at the print on the sheet until January 29, when the prosecution met prior to the trial and decided that all of the evidence needed to be looked at again. It was upon this later examination that Sgt. Hunter realized that the palm print looked like it was of a left hand that was missing the same two fingers that Petitioner was missing on his left hand. This court found Sgt. Hunter's testimony eminently credible and his explanation for not having initially given significance to the palm print understandable and, again, credible.

With respect to the *Brady* aspect of this claim, Petitioner has failed to provide any proof whatsoever that any evidence pertaining to the bloody palm print was favorable to him, that any evidence pertaining to the bloody palm print was withheld, intentionally or unintentionally, and/or that Petitioner was prejudiced in any way by either Sgt. Hunter or the prosecution team with respect to the manner in which the evidence at issue was discovered and divulged. Sergeant Hunter testified that he showed the print to defense counsel on January 30, the day after he recognized its significance.

13

*Id.* at \*77.  Finally, Petitioner claimed the bloody palm print was not his.  In support of this claim, Petitioner relied on the report of Herbert MacDonell of the Laboratory of Forensic Science in New York.  The district court stated:

> Based on this report, Petitioner argues that: 1) the bloody palm print cannot be his because it has a ring finger, whereas he does not; 2) the ridge detail on the palm print is not from the ridges on a hand, but "just texture of the sheet"; 3) the match made between Petitioner's palm print and the bloody palm print on the sheet is "illusory."

> As to Petitioner's first argument, the report does, in fact, make several references to a ring finger that Petitioner does not have.  However, MacDonell's analysis was limited to "photographs, reports, a transcript, and palmprint. . ."  Moreover, apart from MacDonell's vague reference to the "nature of . . . fabric which allows it to be 'teased,'" nowhere in the report does MacDonell take into consideration, or make any allowances for, the fact that he was comparing Petitioner's palm print taken in a controlled setting, on a smooth flat surface (paper or a piece of cardstock), backed by a solid surface (a table or desk) with the bloody palm print that was made in the heat of a violent triple-murder, on a surface subject to distortion, wrinkles, and folds (the sheet), on a soft background (the mattress), itself capable of movement and causing distortion.  This conclusion is supported by MacDonell's statement that, for there to be a match, "there should be a good agreement between the bloodstain image and the general outline of Mr. Smith's hand," which MacDonell concluded there was not.

> It is intuitively obvious that there is little likelihood that a "geometric" match, to use MacDonell's terminology, could be found between two prints made under such polar-opposite circumstances.  Based on this apparent flaw in MacDonell's analysis of the "photographs, reports, a transcript, and palmprint . . .," and the clear image of the two missing middle fingers in the photograph of the bloody palm print actually analyzed by MacDonell, the court is not persuaded that the report establishes that the bloody palm print has a ring finger.

> Next, Petitioner argues that the "ridge detail on the palm print is not from the ridges on a hand, but 'just texture of the sheet.'"  The report provides the following with respect to this claim:

>> The photocopy I received of the enhanced 'Latent Palm Print' exhibit is typical of bloodstains on the surface of woven textiles.  It should be noted that what is assumed to be friction ridge detail is at a 45 degree angle to the vertical and horizontal

14

weave pattern. This type of pattern is consistent with a surface transfer by an object having no ridge detail whatsover [sic].

Separation of a pattern resulting from the weave or texture of a fabric from friction ridge detail left by a bloody finger, palm, or foot has long been recognized as a serious problem. Identification made with evidence of this type must always be carefully scrutinized.

The report does not say, as Petitioner would have the court believe, that what appears to be ridge detail on the bloody palm print is just the texture of the sheet. MacDonell's observation is only that the pattern, observed forty-five degrees to the "vertical and horizontal weave pattern," is consistent with no ridge detail. Neither here, nor anywhere else in the report, does MacDonell state definitively that there is no ridge detail on the bloody palm print, much less that Sgt. Hunter had mistaken the weave pattern for ridge detail. On the contrary, in his conclusion that "[t]he prosecution can not have it both ways," MacDonell appears to concede that it is possible to view the bloody palm print as exhibiting ridge detail - but if that is the case, then he concludes that the prosecution "match[ed] the overall handprint . . . completely wrong."

As to MacDonell's alternative conclusion that, if the ridge detail is correct, then the overall match is wrong, the court has previously noted that MacDonell's inability to make a "geometric" match stemmed from the vastly different circumstances under which the two prints were made and his failure to take those circumstances into consideration in his analysis. Therefore, notwithstanding MacDonell's views to the contrary, the court concludes that the prosecution can have it both ways. Specifically, it is entirely reasonable to conclude that the two palm prints, made under the radically different circumstances described above, would not yield a geometric match when superimposed on one another. Second, given the distortion of the bloody palm print caused by the circumstances under which it was left on the sheet, it is equally reasonable to conclude that a specific physical feature exhibited by the palm print made under controlled circumstances could give the appearance of being on another part of the bloody palm print because of that distortion.

Finally, the court addresses Petitioner's claim that the match made between Petitioner's palm print and the bloody palm print on the sheet is "illusory." Not only does Petitioner misstate the report, there is nothing in the report that would support even an inference that this is the case. Although MacDonell does conclude that there is "no compelling evidence to suggest

15

Mr. Smith is the only person who could have left the bloodstain pattern on the sheet," he also writes that:

> While it is impossible to conclude that the faint stained areas on the blue sheet were not made by the hand or fingers of a specific individual, it can be stated that a positive identification can not be made from the photocopies of the exhibits that were submitted to this laboratory.

In other words, although MacDonell was unable to make a positive identification based on the materials that had been submitted to him for analysis, he conceded that it was impossible to conclude that a specific individual could not be identified based on the print on the sheet. Based on MacDonell's own words, the report on which Petitioner relies to support his claim that the bloody palm print is not his is, at best, inconclusive.

   As reasoned above, none of the arguments proffered by Petitioner establishes his innocence.

*Id.* at *85-87.

During subsequent federal habeas litigation, Petitioner secured the services of another expert, Kathleen Bright-Birnbaum (the same expert upon whom Petitioner relies in his current Fingerprint Act petition), to attempt to challenge Sgt. Hunter's trial testimony. The district court denied Petitioner's additional challenge to counsel's representation regarding the palm print evidence:

> . . . Petitioner now argues that, if counsel had conducted a thorough investigation of the latent print evidence at the crime scene, they could have demonstrated that the prosecution's fingerprint witness, Johnny Hunter, was unreliable and could have shown that the presence of prints that were not his own "show[ed] someone else's guilt." The court has reviewed Petitioner's new evidence - the fingerprint analysis report of Kathleen Bright-Birnbaum - and disagrees with Petitioner's conclusions.
>
>    Sergeant Johnny Hunter testified at trial that only one print found at the crime scene was identified as Petitioner's: the bloody handprint on the sheet near Judy Smith's body. He explained that the print bore fifteen points of identification, compared to the minimum eight points required by the FBI, and that there was "no doubt" that the print belonged to Petitioner. Hunter said that all the other prints found in the home either matched the victims (which he testified would be expected, "because anytime you have a crime scene you're going to have fingerprints on that crime scene of the victim"),

were insufficient for comparison, or did not match any known individual. Bright-Birnbaum disagrees with Hunter's conclusions about several of those prints. She says that two prints identified as those of one resident victim were actually made by another resident victim and that several of the prints Hunter found insufficient for comparison were actually identifiable but did not match any known individual. She also identified two additional prints left by resident victims and several prints of the officers who investigated the crime scene. But establishing that the victims and others were in their own home at some point does nothing to show someone else's guilt, as Petitioner suggests, so none of the disagreements between Bright-Birnbaum and Hunter about the latent fingerprint evidence would have had any impact on the outcome of Petitioner's case. *Carter v. City of Detroit*, No. 11-15322, 2016 WL 319514, at *4 (E.D. Mich. Jan. 27, 2016), *aff'd*, 678 Fed. Appx. 290 (6th Cir. 2017) (because unidentified prints do not preclude a defendant's presence at the same location, such evidence "is not exculpatory because it cannot be said that such evidence is inconsistent with the prosecution's case or [that it] tends to support the defendant's case").

The only print that was material to Petitioner's conviction was his bloody handprint on the sheet [footnote omitted], which neither Bright-Birnbaum's report nor any other evidence offered by Petitioner disputes. Petitioner argues that disputing the accuracy of Hunter's analysis of the latent prints could have resulted in excluding him from testifying at trial. Even accepting that leap, the fact that an expert that defense counsel consulted about the bloody handprint agreed that it was Petitioner's, *[s]ee Smith v. State*, 1998 WL 345353, at *15, 16, and Petitioner's inability to date to produce any conflicting expert opinion about that print suggest that the prosecution could easily have called another expert to testify that the bloody handprint belonged to Petitioner.

*Oscar Smith v. Wayne Carpenter, Warden*, No. 3:99-CV-0731, 2018 WL 317429, at *9 (M.D. Tenn. Jan. 8, 2018). The Sixth Circuit agreed:

Jurists of reason could not disagree with the district court's conclusion that Bright-Birnbaum's report is insufficient to establish prejudice from counsel's allegedly deficient performance. It is noteworthy that Bright-Birnbaum agrees with many of Sgt. Hunter's conclusions regarding the individual prints, and her determination of mis-identification is limited to two prints. While Bright-Birnbaum contends that a number of prints have identifiable value, which differs from a portion of Sgt. Hunter's findings, none of these prints uncovers any evidence of significance. Smith believes that these unidentified prints could belong to potential suspects in the murders, but it is more likely that they belong to visitors of the victims' home.

17

Most critically, Bright-Birnbaum's report does not challenge Sgt. Hunter's conclusion regarding the key piece of fingerprint evidence - that the bloody handprint on the sheet near Judy Smith's body belonged to Petitioner. At most, Bright-Birnbaum's report raises some question about Sgt. Hunter's credibility, but it does not rise to the level of demonstrating a reasonable probability that, except for counsel's allegedly deficient performance, the result of Smith's trial would have been different.

*Smith*, 2018 WL 7247244 at *3.

## Fingerprint Act

This is a case of first impression involving statutory construction of the Fingerprint Act. Statutory construction is a question of law that we review de novo. *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017). "The role of this Court in construing statutes 'is to give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *State v. McGouey*, 229 S.W.3d 668, 672 (Tenn. 2007) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "In ascertaining the intent of the legislature, this Court may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005)).

We begin with the statute's language and give the legislature's chosen words their natural and ordinary meaning. *State v. Edmondson*, 231 S.W.3d 925, 927 (Tenn. 2007). In so doing, we construe the words of the statute "in the context in which they appear in the statute and in light of the statute's general purpose." *Id.* "When a statute's text is clear and unambiguous, the courts need not look beyond the statute itself to ascertain its meaning." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). We must "presume that the General Assembly used every word deliberately and that each word has a specific meaning and purpose." *Id.*

More importantly, as it relates to the matter at hand, this Court should not incorporate "magic words" into criminal statutes, especially where the legislature has specifically included the proposed language in other statutes but not in the one under dispute. *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000). Statutes that relate to the same subject or have a common purpose are construed "in pari materia." *Edmondson*, 231 S.W.3d at 927. Those statutes must be construed harmoniously, so that they do not conflict. *State v. Turner*, 193 S.W.3d 522, 526 (Tenn. 2006). Additionally, we presume that the legislature is knowledgeable about its prior enactments and knows the state of the law at the time it passes legislation. *Edmondson*, 231 S.W.3d at 927.

The Fingerprint Act permits an appropriate party, such as Petitioner in this case, to file a petition, *at any time*, "requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence." T.C.A. § 40-30-403. Depending on the situation, and after notice to the prosecution and an opportunity to respond, the trial court *shall* or *may* order the requested fingerprint analysis. *Compare* T.C.A. § 40-30-404(1) (the court *shall* order analysis if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis") *with* T.C.A. § 40-30-405(1) (the court *may* order analysis if "[a] reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction"). Both Sections 404 and 405 presume the evidence is still available and in such a condition susceptible to analysis, that it has not already been subjected to the type of analysis being sought by the petition, and that the petition is not being made to unreasonably delay execution of the sentence. T.C.A. §§ 40-30-404(2) to (4) and 405(2) to (4). Petitioner filed his petition pursuant to Section 405. Thus, our analysis will be confined to the terms of that section. As noted above, the trial court has the discretion to order analysis under Section 405.

If the trial court decides to order analysis, based upon the satisfaction of the requirements of Section 405,

> the court must select the laboratory used by the original investigating agency if the laboratory is capable of performing the required analysis. If the laboratory used by the original investigating agency is not capable of performing the required analysis, the court shall select a laboratory that the court deems appropriate.

T.C.A. § 40-30-410. The Fingerprint Act also requires the court to order both parties to produce the reports from any previous independent fingerprint analysis. *Id.* § 40-30-408. Section 408 provides, in its entirety:

> If evidence has previously been subjected to fingerprint analysis by either the prosecution or defense, the court may order the prosecution or defense to provide all parties and the court with access to the laboratory reports prepared in connection with the fingerprint analysis, as well as the underlying data and laboratory notes. If any fingerprint or other evidence analysis was previously conducted by either the prosecution or defense without knowledge of the other party, the analysis shall be revealed in the motion for analysis or response, if any. If the court orders fingerprint analysis in connection with a proceeding brought under this part, the court

19

shall order the production of any laboratory reports prepared in connection with the fingerprint analysis and may, in the court's discretion, order production of the underlying data and laboratory notes.

*Id*. It is clear this section contemplates a situation where, like in this case, a party already obtained independent analysis before filing its petition under Section 403. Section 408 obviously precedes Section 410 which requires a court, if it grants the petition and orders analysis, to select the original (or similar) lab that conducted the analysis in the first instance.

Finally, if the results of the court-ordered fingerprint analysis are not favorable to Petitioner, the trial court is directed to dismiss the petition. T.C.A. § 40-30-412. If, however, the results are favorable, the court shall then schedule a hearing and thereafter issue any order required by the Rules of Criminal Procedure or the Post-Conviction Procedure Act. *Id.*

This Court concludes the Fingerprint Act's text is clear and unambiguous; thus, we need not look beyond the statute itself to ascertain its meaning. To that end, because the language of the Fingerprint Act mirrors, for the most part, the wording of the Post-Conviction DNA Analysis Act of 2001 (hereinafter "DNA Act"), the trial court looked to case law discussing the DNA Act for guidance in ruling on the instant petition. *Compare* T.C.A. §§ 40-30-301 to -313 *with* T.C.A. §§ 40-30-401 to -413. We agree with that logical decision. The appellate courts of this state have had ample opportunity over the last twenty years or so to interpret the meaning of the DNA Act.

In the following discussion of the established case law on the DNA Act, we will substitute "fingerprint analysis" and citations to the relevant code sections of the Fingerprint Act for "DNA analysis" and related citations to the DNA Act.

As this Court has noted, a trial court is not required to hold a hearing to determine whether a petition for [fingerprint] analysis should be granted or denied. *See Charles Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589 at *3 (Tenn. Crim. App. May 24, 2018)*, no perm. app filed*. Similarly, a petitioner must satisfy all four elements of Section 405 before the trial court will order [fingerprint] analysis. *See Powers*, 343 S.W.3d at 48. The only debate in this case is whether the requirement of Section 405(1) was satisfied: "A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered Petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." T.C.A. § 40-30-405(1). "The definition of 'reasonable probability' has been well-established in other contexts, and is traditionally articulated as 'a probability sufficient to undermine confidence in the outcome'" of the prosecution. *Powers*, 343 S.W.3d at 54 (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) and *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

20

As the supreme court instructed in *Powers*, we begin with the proposition that the [fingerprint] analysis will prove to be favorable to Petitioner. *See* 343 S.W.3d at 55, n.28. "While courts must also consider the evidence that was presented against Petitioner at trial, the evidence must be viewed in light of the effect that favorable [fingerprint] evidence would have had on the fact-finder or the State." *See id.* at 55. "[T]he analysis must focus on the strength of the [fingerprint] evidence as compared to the evidence presented at trial - that is, the way in which 'the particular evidence of innocence interacts with the evidence of guilt.'" *See id.* (citation omitted). However, there is no presumption of innocence afforded a petitioner who requests [fingerprint] analysis pursuant to the Act. *See Charles Elsea*, 2018 WL 2363589 at *4.

"It may also be proper to 'consider . . . any stipulations of fact by Petitioner or his counsel and the state' in making this determination." *Powers*, 343 S.W.3d at 55. (quoting *Mark A. Mitchell v. State*, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649 at *4 (Tenn. Crim. App. Apr. 11, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003)). Again, because a trial court is not required to hold a hearing in order to decide whether testing should be granted, thus limiting the record on appeal, "'the opinions of [the appellate courts] on either the direct appeal of the conviction or the appeals in any previous post-conviction or habeas corpus actions may provide some assistance. These sources provide the essential facts of the crime at issue and may be helpful to trial courts in their assessment of the merits of any claim.'" *Id.* at 56 (quoting *Mitchell*, 2003 WL 1868649 at *9).

"Previous appeals should not, however, be used to determine 'the merits of any claim,' that is, whether the reasonable probability threshold has been established." *Id*. "Courts, therefore, should guard against denying petitions for post-conviction [fingerprint] testing under the Act based upon an appellate court's prior determination that the evidence on direct or post-conviction appeal, which was reviewed in the light most favorable to the State, was sufficient to convict." *Id*. at 57. "The 'reasonable probability' inquiry under section 40-30-[405(1)] of the Act requires courts to look at the effect the favorable [fingerprint] evidence would have had on the evidence at the time of trial . . . , not on the evidence as construed by an appellate court in the light most favorable to the State." *Id*.

Contrary to Petitioner's assertion otherwise, because a trial court maintains the discretion to order testing under Section 405, this Court reviews the matter under an abuse of discretion standard and thus will not reverse the trial court's decision unless it is unsupported by substantial evidence. *See Eddie Medlock v. State*, No. W2018-01693-CCA-R3-PC, 2019 WL 3071756 at *2 (Tenn. Crim. App. Jul. 12, 2019), *perm. app. denied* (Tenn. Sept. 18, 2019).

**Petition and Trial Court Ruling**

In support of the instant petition, Petitioner again secured the services of Bright-Birnbaum on his own accord. Bright-Birnbaum's recent "Declaration," signed and dated

21

June 29, 2021, is attached to the petition. Bright-Birnbaum states "the prevailing accepted analysis, procedures and articulation of latent print examination has significantly changed" since 1990. To that end, she states:

> It is no longer accepted to make a match solely on a specified number of points. (Another change is that identifications are no longer testified to as absolute.) Instead of simply counting the number of "points," latent print examiners in the United States and most other countries around the world utilize three levels of detail, using both quantitative-qualitative measures.

Having examined the bloody palm print (which she says is of poor "clarity/quality") pursuant to the quantitative-qualitative model, Bright-Birnbaum opined "the evidence is *inconclusive* as to whether [Petitioner] is the source of the palm print from the crime scene." (Emphasis added). She further stated, "Mr. Hunter utilized outdated analysis that focused exclusively upon the number of points to make a comparison. In my opinion, there is insufficient support for Mr. Hunter's conclusion of identification of the print using current analysis procedures." Bright-Birnbaum concluded her report by stating: "It is my professional opinion, to a reasonable degree of scientific certainty under the currently accepted standards for latent print identification, that Mr. Hunter's conclusion that the bloody print on the bed left 'no doubt' as to the identity of the perpetrator is not supported."

After discussing the Fingerprint Act and pertinent case law, the trial court initially determined Petitioner satisfied three of the four requirements of Section 405. *See* T.C.A. § 40-30-405(2) to (4). However, it ultimately concluded that no reasonable probability existed that the jury would have returned a more favorable verdict or sentence if expert testimony had been offered for the opinion that the source of the bloody palm print could not be identified. *See* T.C.A. § 40-30-405(1). The trial court thus ruled that Petitioner was not entitled to court-ordered fingerprint analysis. The trial court also ruled Petitioner failed to satisfy all four requirements of Section 404. The trial court also reviewed the findings of Bright-Birnbaum's report and found them unpersuasive. In support of its conclusion, the court cited two opinions by this Court dealing with the DNA Act: *James Eric Winston v. State*, No. M2006-01699-CCA-R3-CD, 2007 WL 2351164 (Tenn. Crim. App. Aug. 20, 2007), *no perm. app. filed*, and *Steven Craig Griffin v. State*, No. M2008-00242-CCA-R3-PC, 2009 WL 564228 (Tenn. Crim. App. Mar. 5, 2009), *perm. app. denied* (Tenn. Jun. 15, 2009). Both of those cases essentially held that inconclusive testing results do not equate to "favorable" results.

**Discussion**

Petitioner argues the trial court erred in denying him a hearing under Section 412 because, by the time he filed his petition, he already obtained what he deems to be favorable results from the fingerprint analysis of his own expert. In addition, and despite the fact he specifically states in his petition that he relies upon the provisions of Section 405, Petitioner

22

also argues the trial court confused the different standards set forth in Sections 404 and 412 and thus erred in denying him a hearing: The Petitioner frames his issue by stating the trial court "[I]n failing to recognize that the Fingerprint Act sets forth differing procedures with respect to 'exculpatory' versus 'favorable' prints, the court, then, proceeded to intermingle the two, erroneously imputing the 'exculpatory' requirement from Section 404 into the analysis of [Petitioner's] entitlement to a hearing under Section 412." According to Petitioner's argument on this point, because Section 412 mandates a hearing if the results of the analysis are favorable, the "favorability" of the results may differ depending on whether Section 404 or 405 applies. To that end, Petitioner contends the trial court erroneously required him to prove the results of the analysis are exculpatory, as contemplated by Section 404, rather than favorable.

The State argues Petitioner misinterprets the intent of the Fingerprint Act. According to the State, the statute permits the trial court to order analysis *only* if a petitioner first satisfies the requirement of Section 405, mainly that "a reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." T.C.A. § 40-30-405(1). We agree. The State also contends the trial court correctly determined Petitioner did not satisfy Section 405(1). We, too, agree.

Section 403 of the Act provides that a party may *petition* the court for "the performance of fingerprint analysis of any evidence" in the State's possession. T.C.A. § 40-30-403. The Act does not detail what information or documentation a petition must contain other than suggesting the moving party shall affirm that the evidence has not already been subjected to the particular analysis being requested. T.C.A. § 40-30-405(3). If the court decides to order fingerprint analysis, the statute directs the court to select the original laboratory, or another lab deemed appropriate, to conduct the analysis. T.C.A. § 40-30-410. Accordingly, although Petitioner attached to his petition results from an independent analysis previously conducted, the trial court was still required, first, to consider whether Section 405(1) has been satisfied, and second, if fingerprint analysis is ordered, to choose the original or similar lab to conduct the test. In his reply brief, Petitioner argues the Act provides different procedures for the trial court to follow: one in a case in which a petitioner has already obtained fingerprint analysis and another where a petitioner is requesting the court to order the analysis. Petitioner simply misinterprets the intent of the Act in this respect. Petitioner was obviously free to obtain (and pay for) his own independent analysis. But that does not discount the trial court's obligation, *after* a petition has been filed by an appropriate party, to first decide whether 405(1) has been satisfied. If the court answers in the affirmative, the Act mandates testing by the original, or other appropriate, lab. T.C.A. § 40-30-410. Only then does the trial court move onto the directives set forth in Section 412. T.C.A. § 40-30-412. The fact Petitioner already paid for his own independent testing does not mean the trial court can ignore the mandates of the Act. Section 408 contemplates the scenario presented in this case by requiring either

23

party to disclose the results of any independent analysis already obtained. T.C.A. § 40-30-408 ("the analysis shall be revealed in the motion for analysis"). It does not require the court, for obvious reasons, to consider only that independent analysis.

Petitioner focuses his argument on appeal on the meaning of the word "favorable," both in the context of Section 405(1) ("fingerprint results that would have rendered the petitioner's verdict or sentence more *favorable*") and Section 412 ("If the results of the post-conviction fingerprint analysis are *favorable*"). *See* T.C.A. §§ 40-30-405(1) and -412 (emphasis added). However, the first, and most crucial, step the courts must decide in the process is whether "a reasonable probability exists" that testing of the fingerprint evidence would result in a more favorable verdict or sentence. *See* T.C.A. § 40-30-405(1). Petitioner cursorily addresses this question in a footnote in his principal brief by suggesting Bright-Birnbaum's report would have served to impeach the trial testimony of Sgt. Hunter. However, because the trial court must presume the fingerprint analysis would be favorable to Petitioner before determining whether there is a reasonable probability of a more favorable verdict or sentence, Bright-Birnbaum's report is not relevant in this analysis. *Powers*, 343 S.W.3d at 55, n.28. We note that, although Petitioner insists Bright-Birnbaum's report is favorable to him, she merely opined that "the evidence is inconclusive as to whether [Petitioner] is the source of the palm print from the crime scene" and that "Mr. Hunter's conclusion that the bloody print on the bed left 'no doubt' as to the identity of the perpetrator is not supported."

Again, the Act permits a party to request testing (Section 403), then requires the court to determine whether testing should be ordered (Section 405), then, if the petition is not dismissed, directs the court to order the testing at a specific lab (Section 410), and, finally, permits the court to conduct a hearing on the matter if favorable testing results are obtained (Section 412). We do not agree with Petitioner's argument that a hearing must occur simply because he has attached to his petition independent results which he deems to be favorable. Such a procedure would ignore the overall intent of the Fingerprint Act and puts the proverbial cart before the horse.

The trial court found no reasonable probability the jury would have returned a more favorable verdict or sentence if evidence was presented at the time of trial that the source of the bloody palm print was inconclusive. T.C.A. § 40-30-405(1). There is substantial evidence in the records to support that conclusion. Again, "[a] reasonable probability of a different result exists when potentially favorable [fingerprint] results 'undermine the confidence in the outcome of the prosecution.'" *Charles Elsea*, 2018 WL 2363589, at *4. As the trial court observed, "the State possessed extensive circumstantial evidence against Petitioner other than the palm print, including (1) Petitioner's prior threats against and/or prior violence involving the victims; (2) a neighbor seeing Petitioner's car in the victims' driveway the night of the murders; (3) life insurance policies taken out by Petitioner on the lives of the three victims, and (4) one of the child victims yelling out 'Frank, no!' on the 911 recording." Moreover, as the trial court noted, "[t]he evidence introduced at trial

24

suggested Petitioner (and nobody else) had motive to kill the victims." Two of Petitioner's co-workers testified Petitioner solicited them to kill his wife. Likewise, as summarized above, evidence, in addition to the neighbor's testimony, was introduced to contest Petitioner's alibi defense. The jury also learned Petitioner referred to his estranged wife in the past tense during questioning by the police and he did not "ask the officers the logical questions of where, when, how and by whom" when he was informed about the murders. *Oscar Smith*, 2005 WL 2416504, at *4. The post-conviction evidence also revealed Petitioner "was not contesting that the print was his; he was claiming that someone planted the print at the scene." *Oscar Franklin Smith*, 1998 WL 345353, at *15. Even Bright-Birnbaum could not conclusively state Petitioner did not leave the bloody palm print at the crime scene.

We are mindful all of the trial evidence must be viewed in light of the effect the favorable fingerprint evidence would have had on the jury during both stages of the trial in this capital case. *Powers*, 343 S.W.3d at *Id.* at 55. That is, "[t]he 'reasonable probability' inquiry under section 40-30-[405(1)] of the Act requires courts to look at the effect the [favorable fingerprint] evidence would have had on the evidence at the time of trial . . ., not on the evidence as construed by an appellate court in the light most favorable to the State." *Id.* at 57. In the case at hand, if we stacked the assumed most favorable fingerprint evidence on one side of a set of scales and the trial evidence on the other, the fingerprint evidence would not even begin to affect the scales or tip them in Petitioner's favor, either as to the guilty verdict or the sentences of death. Accordingly, we conclude the trial court did not abuse its discretion in determining no "reasonable probability" existed that Petitioner would have received a more favorable verdict or sentence. The trial court's judgment is supported by substantial evidence.

Having concluded Petitioner did not satisfy Section 405(1), the trial court could have correctly summarily dismissed the petition at that point. Instead, it proceeded to review whether Bright-Birnbaum's test results were favorable pursuant to Section 412. A Section 412 analysis was not needed since Section 405(1) was not satisfied. As discussed above, because the trial court must presume the fingerprint analysis would be favorable to Petitioner before determining whether there is a reasonable probability of a more favorable verdict or sentence, Bright-Birnbaum's results were irrelevant to the court's analysis. And because we conclude the trial court did not abuse its discretion in finding Section 405(1) was not satisfied, it is unnecessary for this Court to even consider the trial court's assessment of the results of Bright-Birnbaum's testing.

**Conclusion**

Pursuant to the discussion above, the ruling of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE

25